(No. 58446.—
(No. 58464.—
(Nos. 58620, 58626 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEAMON JORDAN, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GREGORY WOODS, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY SPARKMAN, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ARVEL ROWE, Appellant.

*Opinion filed September 20, 1984.*

194

Robert Agostinelli, Deputy Defender, and Pamela A. Peters, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert and James E. Fitzgerald, Assistant Attorneys General, of Chicago, of counsel), for the People.

Steven Clark, Deputy Defender, and Michael J. Pelletier, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark T. Rotert, Assistant Attorney General, and Michael E. Shabat, Joan S. Cherry, and Lawrence R. Stasica, Assistant State's Attorneys, of Chicago, of counsel), for the People.

James J. Doherty, Public Defendant, of Chicago (Donna Hickstein-Foley, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield,

and Richard M. Daley, State's Attorney, of Chicago (Mark T. Rotert, Assistant Attorney General, and Michael E. Shabat, Joan S. Cherry, and Lawrence R. Stasica, Assistant State's Attorneys, of Chicago, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Donna Hickstein-Foley, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark T. Rotert, Assistant Attorney General, and Michael E. Shabat, Joan S. Cherry and Lawrence R. Stasica, Assistant State's Attorneys, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

These causes have been consolidated for purposes of appeal since each case asks the court to interpret section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)). The facts of the cases are adequately stated in the appellate court opinions and will be discussed here only to the extent necessary to resolve the issues presented.

## CAUSE NO. 58446

Following a bench trial in the circuit court of Will County, defendant, Leamon Jordan, was sentenced to concurrent extended terms of imprisonment of 60 years for felony murder by accountability, and 14 years for kidnaping, a Class 2 felony. The appellate court affirmed

the judgments (114 Ill. App. 3d 16), and we allowed defendant's petition for leave to appeal (87 Ill. 2d R. 315(a)).

Defendant argues that the extended-term sentence for the lesser offense, kidnaping, was improper. In addition, he raises two other issues: (1) Did the trial court err in permitting forensic odontologists to testify as to the cause of death? (2) Did the State's failure to preserve the victim's jaw deny him due process?

The record shows that on February 26, 1980, approximately one year prior to defendant's arrest, the victim's skull and several bones were recovered by police investigators. These remains were taken to the Will County coroner, where an autopsy was performed. When the examination was completed, the skull, jaw, and bones were photographed. The remains were then returned to the victim's family in accordance with section 10.7 of "An Act to revise the law in relation to coroners" (Ill. Rev. Stat. 1979, ch. 31, par. 10.7), which provides that, as soon as may be consistent with the performance of his duties, the coroner shall release the body of the decedent to the next of kin for burial. At the family's request, the remains were then cremated.

Defendant, in a pretrial motion, moved to exclude dental testimony regarding the cause of death. The basis of the motion was the conclusion of forensic odontologist, Dr. George Morgan, that examination of the victim's jaw revealed that the teeth appeared pink, indicating that the victim was strangled. Defendant argued that the "pink tooth theory" was too conjectural to be probative. He also moved to dismiss the cause against him because the State failed to preserve the jaw which, he claimed, denied him the right to independently examine and rebut the evidence.

At a hearing on defendant's motion, four forensic odontologists testified regarding the "pink tooth theory."

The photographs of the victim's jaw were shown to each of the experts. Doctors George Morgan and Lester Luntz testified as experts for the State. Dr. Morgan indicated that he examined the jaw firsthand and that the teeth were actually "pinker" than depicted in the photographs. Both experts agreed that there are numerous causes of "pink teeth," one of which is strangulation. Although Dr. Morgan and Dr. Luntz agreed that forensic dentists were not qualified to determine the cause of death, they could conclude by process of elimination that, in this case, the victim's "pink teeth" were probably caused by strangulation.

Dr. Edward Pavlik, defendant's expert, opined that only one of the photographs showed a "pinkish" tinge. He listed several possible causes for "pink tooth," including vitamins, drowning, decomposition in an open environment, and strangulation. Dr. Pavlik testified that a forensic dentist could not determine the cause of death by examining only a jaw nor could a single probable cause of "pink tooth" be determined.

Dr. Donald Eugene Ore also testified for the defense. He stated that the color variation of the teeth from each photograph was "remarkable." He indicated that such a variance could be caused by distance, light, and the type of film used. Dr. Ore stated that it was possible that none of the photographs accurately depicted the color and that, in any case, he could not make an accurate determination of color because the photographs did not have a balance or color chart, which is routinely included in these types of photographs.

The trial judge denied the motion, holding that the inaccessibility of the physical evidence would not deny defendant the right to confrontation. He reasoned that the question was one of admissibility and that therefore, the test was whether the dental testimony would assist the trier of fact and whether the prejudicial effect out-

weighed the assistance to the trier of fact. He stated:

"Clearly, the experts on both sides are representatives of what has become accepted as a specialized field of scientific knowledge, and that is the field of dental odontology. \*\*\* Clearly, all of the experts admitted that they were not qualified to give an opinion, a medical opinion as to the cause of death. However, the State's experts feel that they are able to give an opinion as to the possible cause of the specific phenomenon which they call pink tooth. \*\*\* I think we could all agree that that testimony standing by itself is not in any way enough to establish cause of death beyond a reasonable doubt, but I think that's not the test. At this point, the test is whether or not it will be of some assistance to the trier of fact. Then we would have to look at whether or not the prejudicial effect outweighed [that] assistance."

Evidence on this issue was introduced at trial through stipulation. In addition, Dr. Charles Warren, a forensic anthropologist; Dr. Rassmusen, assistant to Dr. Morgan; Lieutenant Coroner William Ferguson; and Deputies Nick Figarello and Patrick Barry each stipulated that they observed the skull firsthand and noted a pink color in the victim's teeth.

The court found defendant guilty of felony murder by accountability and kidnaping. After determining that each offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty, it sentenced defendant to multiple extended-term sentences, to be served concurrently. The appellate court affirmed, holding that the trial court did not err in imposing multiple extended-term sentences. 114 Ill. App. 3d 16.

## CAUSE NO. 58464

Defendants, Anthony Sparkman and Gregory Woods, were charged with the attempted murder, armed robbery, rape, and deviate sexual assault of R.L.; and the attempted murder and armed robbery of M.J., all of

which are Class X felonies. We note that a codefendant, not involved in this appeal, Larue Norals, was also charged with the same offenses. Following a jury trial in the circuit court of Cook County, defendants were convicted of all offenses. After finding each crime was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty, the court sentenced both defendants to extended-term sentences for each of their convictions. Specifically, each defendant was sentenced to 35 years for the attempted murder of M.J. and 35 years for the armed robbery of M.J., to be served concurrently. As to the offenses against R.L., they were each sentenced to 50 years for attempted murder, 50 years for armed robbery, 50 years for deviate sexual assault and 50 years for rape, to be served concurrently. In addition, the sentences relating to the M.J. convictions were to be served consecutively to the sentences imposed on the convictions relating to R.L. The appellate court, by order (87 Ill. 2d R. 23), affirmed the judgments (113 Ill. App. 3d 1165), and we granted defendants' petition for leave to appeal (87 Ill. 2d R. 315(a)).

Defendants argue that the imposition of an extended-term sentence for each of their convictions is not permissible. In the alternative, they maintain that the extended terms imposed for the armed robbery, rape and deviate sexual assault of R.L. are improper because those offenses were not accompanied by exceptionally brutal or heinous behavior.

M.J. and R.L. testified as to the events which took place on April 17, 1980. At approximately 2 a.m. that morning, M.J. and R.L. went to M.J.'s apartment in Chicago. While the two women were in the hallway of the apartment building, they met Sparkman, Woods, and Norals. M.J. and R.L. walked towards M.J.'s apartment, and the three men followed. When they arrived at the apartment, Sparkman asked if they could come inside

for a few minutes. Since M.J. had previously met both Sparkman and Norals, she agreed.

M.J. took her guests into the bedroom, the only furnished room in her apartment. The group sat talking and watching television for approximately one hour, after which M.J. asked the men to leave. She escorted them to the door and, at that time, Sparkman grabbed her by the neck and cut her throat with a knife. He then carried her back to the bedroom and dropped her on the floor. He removed and searched her clothing. Woods then stuffed rags into M.J.'s mouth and put a pillow over her face, while Sparkman stabbed her in the stomach several times.

During this time, Norals searched the bedroom closet, where he took $70 from a box. Woods then went over to R.L., put a knife to her neck, and ordered her to get onto the bed and remove all of her clothing. He searched the pockets of the clothes and took $10. Woods then raped R.L. and when he was finished, Norals forced her to perform fellatio. Thereafter, Sparkman sodomized R.L. During this time, R.L. observed Woods bending over M.J., cutting her and inserting pills into the wounds. Sparkman then tried to cut R.L.'s throat but complained that the knife was not sharp enough. He ordered Woods to get another one and Woods retrieved a butcher knife from M.J.'s kitchen. Sparkman used that knife to stab R.L. in the stomach several times. When Sparkman believed that R.L. was dead, he went over to M.J., kicked her in the head and announced that she too was dead.

Sparkman ordered Woods and Norals to wipe off fingerprints from the knife and various objects in the apartment. After doing so, they left. R.L. was able to go to a neighbor's apartment and call her sister. Soon thereafter, an ambulance arrived and took R.L. and M.J. to the hospital. An examination of M.J. revealed 15 or

16 stab wounds in the stomach and a severe laceration on the neck. Drug capsules were found in several of the wounds. R.L. suffered six stab wounds in the stomach and a laceration of her liver. Drug capsules were also found in R.L.'s rectum. A vaginal swab taken from R.L. was positive for the presence of spermatozoa; however, oral and rectal swabs taken from her were negative.

## CAUSE NOS. 58620, 58626

Defendant, Arvel Rowe, was indicted in the circuit court of Cook County for murder and for armed robbery, a Class X felony. A codefendant not involved in this appeal, Ferrel Cunningham, was also indicted for the same offenses. The causes were severed and, following a jury trial, defendant was found guilty of both charges. The court entered judgment on the verdicts and sentenced defendant to extended terms of imprisonment of 60 years for murder and 40 years for armed robbery, to be served concurrently. The appellate court affirmed the convictions and the sentence for murder; however, it reduced the sentence for the armed-robbery conviction. (115 Ill. App. 3d 322.) The defendant, in cause No. 58620, and the State, in cause No. 58626, each filed petitions for leave to appeal. We allowed both petitions and consolidated them for purposes of review. 87 Ill. 2d R. 315 (a).

The State appeals, contending that the extended-term sentence for the lesser offense of armed robbery was proper. The defendant maintains that the extended-term sentence for the murder conviction was not valid because his conviction was based upon an accountability theory.

The evidence at trial showed that on the afternoon of January 2, 1980, defendant and Cunningham robbed a grocery store owned and operated by Mazmi Roughman. Defendant did not carry a weapon, and his participation

in the crime was limited to restraining an employee of the store. Cunningham, however, was armed and, after he took the money from the cash register, he fatally shot Roughman in the chest.

At the sentencing hearing, the trial judge found that there was "brutal and heinous conduct on behalf of the defendant indicating wanton cruelty." He then sentenced defendant to extended-term sentences for both offenses which were to run concurrently. The appellate court affirmed the convictions and the extended-term sentence for murder, concluding that an extended-term sentence could be imposed where defendant's guilt was based upon an accountability theory. However, it held that "defendant could only properly receive an extended-term sentence for his murder conviction since it belonged to the class of the most serious offense of which he was convicted." (115 Ill. App. 3d 322, 330.) It then reduced the sentence for the armed robbery conviction to the maximum term of 30 years.

We will first address the common issue concerning the propriety of imposing multiple extended-term sentences. Defendant Jordan (cause No. 58446) asserts that the extended-term sentence imposed for the lesser offense of which he was convicted, kidnaping, was improper. He maintains that section 5—8—2(a) limits the imposition of an extended-term sentence to the most serious class of offense of which an accused is convicted. The State, in cause No. 58626, argues that defendant Rowe was properly sentenced to an extended term for armed robbery, the lesser offense of which he was convicted. The State contends that under section 5—8—2(a) an extended-term sentence may be imposed in appropriate circumstances for different classes of offenses. Defendants Woods and Sparkman (cause No. 58464) contend that only one extended-term sentence may be imposed under section 5—8—2(a), even if all offenses of which the accused is con-

victed are within the most serious class.

The statute at issue provides, in relevant part:

> "A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 *for the class of the most serious offense of which the offender was convicted* unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a).

This court first considered section 5—8—2(a) in *People v. Evans* (1981), 87 Ill. 2d 77. There, the defendant was convicted of voluntary manslaughter and aggravated battery. The court stated that "Evans could only receive an extended sentence if the voluntary manslaughter offense (a Class 2 felony [citation]—as opposed to aggravated battery, a Class 3 felony [citation])—were accompanied by wanton cruelty." (87 Ill. 2d 77, 87.) The court held that the trial court erred in imposing an extended-term sentence for the voluntary-manslaughter conviction because that offense was not accompanied by brutal or heinous behavior, as it involved the inadvertent shooting of a bystander to a fight between defendant and the victim of the aggravated battery. (But see *People v. Smallwood* (1984), 102 Ill. 2d 190, 193-96 (where armed robbery accompanied by aggravated battery was subject to the provision of section 5—8—2(a)).) The court found that it was the intent of the legislature that unless the most serious offense of which an accused is convicted is accompanied by brutal or heinous conduct, an extended-term sentence may not be imposed. This is true even if the lesser offense was accompanied by brutal or heinous conduct. (87 Ill. 2d 77, 87.) The court noted:

> "When section 5—8—2(a) is read in conjunction with section 5—5—3.2, it is clear from the plain language of the statutes that the most serious offense of which the offender is convicted must be accompanied by exceptionally

brutal or heinous behavior indicative of wanton cruelty. * * *

We recognize that the present legislative scheme could lead to the anomalous result of insulating a defendant from receiving an extended sentence for an offense accompanied by wanton cruelty by virtue of his conviction of a more serious offense." 87 Ill. 2d 77, 87-88.

The State relies upon this court's initial decision in *People v. Williams* (Apr. 16, 1982), No. 51870, for the proposition that extended-term sentences may be imposed in appropriate circumstances for different classes of offenses. There the court affirmed the defendant's extended-term sentences for both rape and aggravated kidnaping, different class offenses. We find, however, that that opinion is not applicable to the issue at bar, since it was withdrawn following a petition for rehearing. (See *People v. Williams* (1982), 93 Ill. 2d 309.) It is well established that a withdrawn opinion has no precedential value because it does not express the views of the court. See *Tallman v. Eastern Illinois & Peoria R.R. Co.* (1942), 379 Ill. 441, 449.

We conclude that *Evans* is dispositive of the issue. The legislature has not amended the statute in question since *Evans*; and we therefore see no reason to depart from our holding in that case at this time. While we recognize that penal statutes are to be strictly construed in favor of the accused, a court must give effect to the legislative intent and must not read a statutory enactment rigidly as to defeat that intent. (See *People v. Bratcher* (1976), 63 Ill. 2d 534, 543.) If the clause "for the class of the most serious offense of which the offender was convicted" were omitted from the statute, we would agree with the State that an extended-term sentence could properly be imposed for a lesser offense of which an accused was convicted. However, the legislature did include that clause, which indicates an intendment to limit

the imposition of extended-term sentences to only those offenses within the most serious class. As stated in *Evans,* the plain language of section 5—8—2(a) requires that, when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class and only if that offense was accompanied by brutal or heinous behavior. (*People v. Evans* (1981), 87 Ill. 2d 77.) Accordingly, we hold that the extended-term sentence imposed for defendant Jordan's conviction for kidnaping was improper, as that offense did not belong to the most serious class of offense of which he was convicted. Similarly, with respect to defendant Rowe, we agree with the appellate court that he was improperly sentenced to an extended term for the lesser offense of which he was convicted, armed robbery.

We turn then to the issue of whether more than one extended-term sentence may be imposed if each offense of which the accused is convicted is within the same class. Defendants Woods and Sparkman cite *Evans* for the proposition that only one extended-term sentence is permissible, even if all offenses of which a defendant is convicted are within the same class. We find that *Evans* is factually inapposite to this case, since both offenses of which Evans was convicted were not within the same class.

We find that the defendants' construction of the statute is too narrow. To interpret the statute as defendants suggest would, in effect, omit the words "the class of" from the italicized clause of the statute. The statute would then permit an extended-term sentence only for "the most serious offense of which the offender was convicted." However, in determining the intent of the legislature, the statute must be read as a whole and all relevant parts considered. (*People v. Hairston* (1970), 46 Ill. 2d 348, 356, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed.

2d 136, 91 S. Ct. 1658.) We note that section 5—5—3.2(b)(2), the aggravating-factors provision, allows an extended-term sentence to be imposed upon *any* felony of which an accused is convicted if that offense was accompanied by brutal or heinous behavior. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2).) Clearly, the legislature did not provide in that section that an extended-term sentence could be imposed only for the most serious felony of which the defendant was convicted. We further note that section 5—8—4(c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(c)(2)) provides that "the aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under [the extended-term provision] for the *2* most serious felonies involved." (Emphasis added.) We find that the legislature's reference to "the 2 most serious felonies involved" indicates an intent that more than one extended-term sentence can be imposed under section 5—8—2(a) and that those sentences may be consecutive, subject to certain limitations. We therefore conclude that when section 5—8—2(a) is read in conjunction with sections 5—8—4(c)(2) and 5—5—3.2(b)(2) it is clear that the legislature intended that more than one extended-term sentence may be imposed. Under our interpretation of section 5—8—2(a), however, extended-term sentences may only be imposed for the offenses within the most serious class of offense of which the accused is convicted. Accordingly, we hold that since each crime of which defendants Woods and Sparkman were convicted was within the same class, *i.e.*, Class X felonies, the trial court could properly impose extended-term sentences for each of those offenses.

We next consider the additional issues raised by defendant Jordan. First, he maintains that the trial court erred in allowing forensic odontologists to testify regarding the cause of death. He argues that the State

failed to establish that its experts were qualified to render such an opinion and that the theory they relied upon had gained general acceptance in the dental community.

It is well established that an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. (See generally *People v. Park* (1978), 72 Ill. 2d 203.) The burden of establishing the qualifications of an expert witness is on the proponent of his testimony, and it is within the discretion of the trial court to determine whether the witness has been qualified. (72 Ill. 2d 203, 209.) Further, in rendering an opinion, the expert must rely upon scientific theories which have gained general acceptance in his field. *People v. Baynes* (1981), 88 Ill. 2d 225, 240. See also *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013.

We note, as did the trial court, that neither of the State's experts opined that strangulation was positively the cause of· death. Dr. Morgan indicated that he could not give an opinion, based upon a reasonable degree of medical and scientific certainty, as to the cause of death. He stated that he could only suggest, on the basis of his knowledge of the case and his experience in the field, that strangulation was a possible cause of death. Similarly, Dr. Luntz stated, given all of the factors in this case, including the elimination of all other causes of "pink tooth" except strangulation, that strangulation was a factor to be considered as a cause of death.

We find that the experts were qualified to testify regarding the "pink tooth" theory. The State questioned both experts at length concerning their education and experience in the field of forensic odontology. The study of the "pink tooth phenomenon" is encompassed within their field of expertise. In addition, neither of defendant's experts testified that the "pink tooth phenomenon"

did not exist or that it was not recognized in the dental community. In fact, expert witnesses for both parties agreed as to most of the causes of "pink tooth," including strangulation. We conclude that based upon these facts, and the facts that the "pink tooth theory" is outside the realm of the knowledge of lay persons, and that the experts' testimony aided the court in understanding the theory and its causes, the court did not abuse its discretion in allowing such testimony.

Defendant Jordan further maintains that the destruction of the victim's jaw denied him his right to due process because he did not have an opportunity to independently examine the evidence. He relies upon *People v. Dodsworth* (1978), 60 Ill. App. 3d 207, and *People v. Taylor* (1977), 54 Ill. App. 3d 454, to support the position that a defendant's fundamental right to know of adverse evidence and to have an opportunity to rebut it are infringed when the State fails to preserve physical evidence which is crucial to his defense. Our examination of those cases, however, discloses that they are distinguishable from the present case. Both *Dodsworth* and *Taylor* involved controlled substances which were destroyed unnecessarily during the testing process by the State. The State here did not destroy the evidence unnecessarily. Rather, it acted in accord with its own procedures and also pursuant to the public policy of this State, as reflected by the statutory mandate that a deceased's remains be released to the next of kin for burial purposes. See Ill. Rev. Stat. 1979, ch. 31, par. 10.7.

The right of an accused to be informed of exculpatory evidence is secured both under the Federal Constitution (see *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194) and by Illinois Supreme Court Rule 412(c) (87 Ill. 2d 412(c)). In *Brady,* the court held that a criminal defendant has a right to have access to evidence that is "material either to guilt or to punish-

ment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1197.) The right to have access to evidence, however, is not absolute. The Supreme Court discussed the issue of the extent to which due process guarantees a criminal defendant access to exculpatory evidence in *Killian v. United States* (1961), 368 U.S. 231, 7 L. Ed. 2d 256, 82 S. Ct. 302. There, the defendant was convicted of giving false testimony in violation of 18 U.S.C. section 1001 (1958). The evidence at trial consisted primarily of an investigatory report prepared by the FBI. Prior to trial, however, the agent who prepared the report destroyed the notes that were made while interviewing witnesses. On appeal, the defendant contended that the destruction of the notes deprived him of the right to confrontation. The court held that the destruction of the evidence did not violate due process. It stated:

"[A]lmost everything is evidence of something, but that does not mean that nothing can ever be safely destroyed. If the agents' notes *** were made only for the purpose of transferring the data thereon *** and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right." *Killian v. United States* (1961), 368 U.S. 231, 242, 7 L. Ed. 2d 256, 264, 82 S. Ct. 302, 308.

In *California v. Trombetta* (1984), 467 U.S. ___, 81 L. Ed. 2d 413, 104 S. Ct. 2528, the court addressed the duty of the State to take affirmative steps to preserve potentially exculpatory evidence on behalf of defendants. In *Trombetta*, each defendant was stopped by the police on suspicion of drunk driving and submitted to an "Intoxilyzer test" which showed a blood-alcohol concentration level substantially higher than the level at which a

driver is presumed to be intoxicated. They were then arrested for driving while under the influence of liquor. Prior to trial, defendants' motions to suppress the Intoxilyzer test results, on the grounds that the State's failure to preserve samples of defendants' breath was a violation of due process, were denied by the trial court.

In holding that the State's failure to retain the breath samples was not a violation of due process, the court noted that the State did not destroy the breath samples "in a calculated effort to circumvent the disclosure requirements established by Brady v. Maryland and its progeny"; rather, it acted " 'in good faith and in accord with their normal practice.' " (*California v. Trombetta* (1984), 467 U.S. ___, ___, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534, citing *Killian v. United States* (1961), 368 U.S. 231, 242, 7 L. Ed. 2d 256, 264, 82 S. Ct. 302, 308.) The court stated:

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case." 467 U.S. ___, ___, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534.

In reaching this conclusion, the court recognized that "[t]he evidence to be presented at trial was not the breath itself but rather the Intoxilyzer results obtained from the breath samples ***" and that the defendants wanted "the breath samples in order to challenge incriminating test results produced with the Intoxilyzer." (467 U.S. ___, ___, 81 L. Ed. 2d 413, 421, 104 S. Ct. 2528, 2533-34.) It found that even assuming that the Intoxily-

zer results were inaccurate and therefore the breath samples might have been exculpatory, it did not necessarily show that the defendants were without alternate means of demonstrating their innocence. The court noted that the defendants had identified only a small number of ways in which an Intoxilyzer may malfunction and that they were able to raise these issues without resort to the breath samples. The court also noted that the defendants were able to cross-examine the police officer who administered the test to attempt to raise doubt in the mind of the fact finder as to whether the test was administered properly. 467 U.S. ___, ___, 81 L. Ed. 2d 413, 423, 104 S. Ct. 2528, 2535.

As in *Trombetta,* there is nothing in the record here to indicate that the State's actions were designed to defeat its duty of disclosure under *Brady.* The State did not destroy the jaw to deliberately suppress exculpatory evidence; rather, it returned the jaw to the family pursuant to a statutory mandate. In addition, assuming *arguendo* that the jaw would have been exculpatory, defendant had an alternate means of raising doubt in the mind of the trier of fact as to the cause of death. Defendant had the opportunity to present evidence as to the causes of "pink tooth" and was also able to scrutinize the State's photographs of the victim's jaw. Further, he was afforded the right to cross-examine the State's experts to attempt to discredit their testimony, and as the record indicates, he took full advantage of that right. Both the State's experts and defendant's experts identified only a small number of causes of "pink tooth"; however, each expert did list strangulation as one cause of the phenomena. We conclude that, based upon these facts, the *Trombetta* requirements—that the evidence possess an exculpatory value that was apparent before it was destroyed and that a defendant be unable to obtain comparable evidence by another means—are not met. Accordingly, we

hold that the State's failure to preserve the victim's jaw did not infringe upon defendant Jordan's right to due process.

We turn now to the contention of defendants Woods and Sparkman that they were improperly sentenced to extended-term sentences for the armed robbery, rape and deviate sexual assault of R.L. Defendants concede that the extended-term sentences for their convictions for the attempted murder of R.L. and M.J. and the armed robbery of M.J. were proper since each of those offenses was accompanied by exceptionally brutal and heinous behavior. However, defendants posit that the extended-term sentences imposed for the armed robbery, rape and deviate sexual assault of R.L. were not proper because those offenses were not accompanied by exceptionally brutal or heinous behavior.

We agree with defendants' assertion that merely finding that an accused's course of conduct, which resulted in multiple convictions, was accompanied by brutal and heinous behavior does not automatically permit the imposition of multiple extended-term sentences. Clearly, before an extended-term sentence may be imposed, the trial court must find that the offense was accompanied by brutal or heinous behavior. See *People v. Evans* (1981), 87 Ill. 2d 77.

In this case, both the trial and the appellate courts found that each felony was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The trial court stated that "the conduct of defendants was wicked beyond the call of human understanding." We agree.

The record shows that defendants tortured R.L. throughout each of the offenses committed upon her. She was stabbed by a butcher knife, repeatedly raped, and exposed to watching her close friend being tortured. Further, after she was raped, stabbed and forced to per-

form deviate sexual acts, defendants inserted pill capsules into her rectum. There can be no doubt that such behavior was exceptionally brutal and heinous.

Finally, defendant Rowe contends that he was improperly sentenced, under section 5—5—3.2(b)(2), to an extended term for murder because that conviction was based upon an accountability theory. Section 5—5—3.2(b)(2) authorizes the trial judge to impose an extended-term sentence "[w]hen a defendant is convicted of any felony and the court finds that *the offense* was accompanied by brutal or heinous behavior indicative of wanton cruelty." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2).) Defendant maintains that a plain reading of the statute makes it clear that the defendant himself, and not one for whose conduct he is responsible, must have engaged in the brutal or heinous behavior. Although he does not dispute the trial court's characterization of the offense as brutal and heinous, defendant emphasizes that he was not the "triggerman" and therefore his conduct was not brutal or heinous.

A similar issue was considered by the court in *People v. Sangster* (1982), 91 Ill. 2d 260. There, it was held that the enhanced penalty of consecutive sentences could be imposed upon a defendant found guilty under a theory of accountability. (91 Ill. 2d 260, 265-66.) The court, citing *People v. Kessler* (1974), 57 Ill. 2d 493, reasoned that the accountability statute " '*** means that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word "conduct" encompasses any criminal act done in furtherance of the planned and intended act.' " (*People v. Sangster* (1982), 91 Ill. 2d 260, 265, quoting *People v. Kessler* (1974), 57 Ill. 2d 493, 497.) The court then noted that the legislature was presumed to know that the accountability statute had been so interpreted and "[h]ad the General Assembly intended

that the consecutive sentencing provisions be inapplicable to a defendant found guilty under [that statute] it would have been a simple matter to provide for an exception as it did in section 9—1(b)(6)(a) of the Criminal Code of 1961." (*People v. Sangster* (1982), 91 Ill. 2d 260, 265-66.) We note that section 9—1(b)(6)(a) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)) provides specifically that the victim be actually killed by the defendant and not by any other party to the crime.

However, the legislature did not provide in section 5—5—3.2(b)(2) that the defendant himself commit the brutal or heinous acts. We therefore conclude that the enhanced penalty of an extended-term sentence may be imposed upon a defendant found guilty upon an accountability theory. Accordingly, we hold that the trial court did not abuse its discretion in sentencing defendant Rowe to an extended term for his murder conviction.

For the reasons stated, the judgments of the trial and appellate courts in cause No. 58446 (People v. Jordan) are affirmed in part and reversed in part. The judgments relating to the extended-term sentence for murder are affirmed, but the judgments as to the extended-term sentence for kidnaping are reversed. We reduce the sentence for kidnaping to a term of seven years, the maximum term authorized under section 5—8—1(a)(5) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(5)) for a Class 2 felony. The judgments of the appellate court in cause No. 58464 (People v. Woods and Sparkman) and in cause Nos. 58620 and 58626 (People v. Rowe) are affirmed.

*58446 — Judgments affirmed in part*
*and reversed in part.*
*58464 — Judgment affirmed.*
*58620, 58626 — Judgments affirmed.*