THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LESTER KEITH HOWARD, Defendant-Appellant.

Second District    No. 83—923

Opinion filed February 19, 1985.

G. Joseph Weller and Michael Braun, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Andrea Becker, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE NASH delivered the opinion of the court:

After trial by jury defendant, Lester Keith Howard, was found guilty of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and home invasion (Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a)(2)). He was sentenced to natural life imprisonment for murder and to an extended term of 60 years for home invasion. Defendant appeals, contending: (1) he was denied the effective assistance of counsel; (2) the State failed to preserve evidence, thus depriving him of the right to due process and to confront witnesses; (3) his guilt of home invasion was not proved; (4) the sentence to natural life imprisonment was excessive; and (5) imposition of the extended term for home invasion was not authorized by the statute.

The evidence at trial disclosed that Bridgett Howard, the wife of defendant's brother, was stabbed to death in her home in the early morning of February 16, 1983. Her husband, Freddie Howard, arrived home at about 2 a.m. and found the body on the floor of their bedroom. Dr. Helen Young, a pathologist, testified death had resulted from more than 116 knife wounds and that a "buck knife," which had been recovered near the deceased's home and contained blood, could have caused the wounds.

The evidence also disclosed there had been arguments between defendant and his brother, Freddie, prior to the death. Defendant had lived in a garage apartment attached to his brother's house which was rented by Gina Grieger. In late January, defendant threatened to kill Freddie during an argument in the apartment and produced a gun; Freddie told defendant to leave the apartment and he apologized. The men argued again a week later, and Freddie ordered defendant not to go near his house when Freddie was not home. A few days later, Freddie found defendant in the apartment and ordered him to leave.

Defendant was arrested on February 16 after discovery of the body and officers noticed fresh cuts on his index finger. Hairs recovered from the bed in decedent's room matched defendant's hair, and a shoe print on the bedspread matched one of defendant's shoes. Witnesses who saw defendant at 8:30 a.m. on February 16 described him as appearing nervous and observed a blood stain on the collar of his jacket. Another witness testified she saw defendant at about 8:30 that morning dressed only in a T-shirt and slacks; defendant told her he was using the nearby laundromat. Henry Jones testified that he had talked with defendant at about 12:30 a.m. February 16 and defend-

ant's conversation rambled and he said he was on "syrup." Defendant pulled out a "buck knife" and chased Jones, then threw the knife at him. Freddie Howard testified he saw defendant outside a tavern at 12:45 a.m. that morning and offered him a ride, which defendant declined.

The State called an F.B.I. agent, an expert witness in blood classification, who had tested blood samples from the murder scene, comparing them with blood samples of defendant, Ricky Belcher and Alvin Foxworth. Many of the tests made were inconclusive, but results for serum haptoglobin on some items of evidence were consistent with the blood of both defendant and Ricky Belcher. The witness testified that 50% of the black population have the same type of haptoglobin as does defendant and as was found at the murder scene; 30% of the black population have the same type blood as did the victim and as found also on some of the examined items. This witness stated that in testing for haptoglobin a blood sample is placed in a gel and, based upon the banding pattern which results, it can be classified as containing one of three types. The gel test samples made in this case were disposed of in the lab shortly after the testing in April 1982. If requested, photos of the samples depicting the banding pattern in the gel could be made, but were not in this instance.

The State also introduced evidence of several statements made by defendant to the police and others relating to this matter. Freddie Howard testified that a week after the murder defendant told him that Alvin Foxworth and Ricky Belcher must have entered the house. Defendant had said he was in the garage apartment and, when he heard a scream, ran upstairs to the deceased's bedroom, but left because he felt other people were there. Defendant also told Gina Grieger he had gone to his brother's house with Foxworth and Belcher, but was in the apartment when he heard decedent scream.

Defendant gave three statements to different police officers after his arrest. He first related that he had been at a bar until 2 a.m. on February 16, after which he went to his mother's home and slept. When he learned later that day his sister-in-law was dead and his brother had been arrested, defendant stated he cut himself on the hand so it would appear he had killed her and the brother would not go to prison. Later the same day defendant was questioned by another officer and signed a typed statement which related that defendant met Belcher and Foxworth outside a tavern at 11:30 p.m. on February 15. They drank, smoked marijuana and used cocaine while discussing how defendant might get even with his brother for throwing defendant out of the apartment. The three men then went to Freddie Howard's house and entered the bedroom so they could jump

the brother when he came home. The decedent, who had been sleeping in the bed, awoke and Belcher stabbed her. Defendant stated he ran from the house. In a third interview, defendant stated he and the other two men decided to enter the Howard home to jump Freddie after they saw his car was not parked at the home. Defendant said he first went to the garage apartment to retrieve some jewelry, then joined the other men in the bedroom. One of the others walked to the bed with a knife and, when defendant heard a scream, he realized his sister-in-law was sleeping there and ran out of the house.

Defendant testified in trial he had never argued with the deceased. He agreed he had talked to Henry Jones that night, but denied threatening him with a knife. Defendant testified he met Foxworth and Belcher and asked them for a ride to his brother's house to pick up jewelry belonging to Gina Grieger, but denied asking them to help jump his brother. Defendant stated that when he left the garage apartment he noticed Foxworth's car was empty and the house door open. He then went up to the bedroom and, feeling someone was there, ran out. Defendant said he was intoxicated and high on cocaine at the time. Defendant testified he signed the statement for the police without reading it because he was high and had told them the same story as in court. He denied asking anyone to help jump his brother or stab decedent.

An expert on blood classification called by the defense testified she was unable to view the gel test samples referred to by the State's expert witness as they had been disposed of. She did examine a diagram the State's witness had drawn for the jury in trial which purported to depict the banding pattern for a particular type of haptoglobin he had found in testing; defendant's witness testified she could not determine from the diagram which type was depicted.

In rebuttal, Alvin Foxworth testified he had not seen defendant on the night in question. His girlfriend and her sister testified they had been with Foxworth that night.

I

■■■ Defendant contends he was denied effective assistance of counsel when his trial attorney failed to file a motion for discharge under the speedy-trial act and by failing to request production of blood test samples before their destruction.

It has been established that an attorney must give reasonably effective assistance to his client and that a defendant claiming ineffective assistance of counsel must show that the attorney's performance was deficient and prejudiced the defense. (*People v. Barnard* (1984), 104 Ill. 2d 218, 233, 237, 470 N.E.2d 1005.) The right to discharge un-

der the speedy-trial act is waived unless a motion is made prior to conviction (*People v. Callahan* (1981), 95 Ill. App. 3d 479, 481, 420 N.E.2d 787, *appeal denied* (1981), 85 Ill. 2d 568; Ill. Rev. Stat. 1983, ch. 38, par. 114—1(a)(1)) and failure of counsel to seek discharge of his client on these grounds can constitute ineffective assistance of counsel. (*People v. Morris* (1954), 3 Ill. 2d 437, 452, 121 N.E.2d 810.) However, failure of counsel to move for discharge cannot demonstrate either deficient performance on his part or prejudice to defendant where there were no lawful grounds to do so. *People v. Gibson* (1975), 30 Ill. App. 3d 555, 559, 333 N.E.2d 549; *People v. Callahan* (1981), 95 Ill. App. 3d 479, 482, 420 N.E.2d 787, *appeal denied* (1981), 85 Ill. 2d 568.

In the present case, defendant remained in custody from his arrest on February 16, 1983, to commencement of trial on September 12. The State and defendant agree that the 120-day speedy-trial term was temporarily suspended by trial continuances requested by defendant from June 13 to July 11 and from July 11 to August 22. They dispute, however, whether the continuance granted by the trial court on August 19, which was on the State's motion and continued the trial date to September 12, was an extension of the 120-day term under section 103—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(c)). If the trial date was not extended under this section, then defendant was brought to trial on the 138th day and would have been entitled to discharge; if, however, the term was so extended, then there was no basis upon which defendant's counsel could have sought discharge.

Section 103—5 provides, in part:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant ***.

* * *

(c) If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days."

Defendant argues that the State never asked the trial court to extend the speedy-trial term or to make the determinations under section 103—5(c). He asserts the State's motion was for a general continuance under section 114—4(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 114—4(c)), the grant of which

would not toll the speedy-trial term, and the trial court thus never exercised its discretion under section 103—5(c).

The verified motion by the State was presented to the trial court on August 19, 1983, when trial was scheduled to commence on August 22. Omitting caption and signatures, it states as follows:

"*Motion to Continue*

Now comes Fred L. Foreman, State's Attorney in and for the County of Lake, State of Illinois, represented by Assistant State's Attorney, Steven McCollum, and hereby moves this Honorable Court to continue the trial of the above-captioned case to September 12, 1983, and in support thereof states:

1. The following material witnesses will be unavailable for trial on August 22, 1983: a) Dr. Helen Young and, b) Detective Donald Meadie.

Wherefore the People respectfully move that this case be continued for Trial on September 12, 1983."

At the hearing of the motion the assistant State's Attorney advised the court that Dr. Young told him she had a scheduled vacation out of the country during the period the case was set for trial and had not taken a vacation in 10 years. She would be available in September. The court was further advised that Detective Meadie was being married that weekend and was going on his honeymoon. Defendant's counsel did not object to the State's motion, saying "Just for the record, we would be ready for trial on the 22nd." The trial court granted the continuance, stating it would be the last one.

Defendant relies upon *People v. Toolate* (1978), 62 Ill. App. 3d 895, 379 N.E.2d 927, in which the reviewing court held that a similar motion for continuance by the State was insufficient and could not be considered as a request for an extension under section 103—5(c), as it more closely resembled a motion for continuance under section 114—4(c) and thus did not toll the 120-day term. The reviewing court noted the motion did not identify the section of the statute under which it was brought and did not mention the due diligence requirement of section 103—5(c) or that the evidence would be available at a later date. It was further noted that the trial court did not make any findings under section 103—5(c), nor did it utilize the 60-day limitation of the statute. The court concluded defendant was entitled to be discharged.

The close analysis of the requirements of a motion under section 103—5(c) made in *People v. Toolate* has been since considered by the appellate court in three cases, each of which distinguished it. In *People v. Folenga* (1980), 83 Ill. App. 3d 210, 404 N.E.2d 935, *appeal denied* (1980), 81 Ill. 2d 595, the State's motion for continuance speci-

fied it was brought pursuant to both sections 114—4 and 103—5, stating a material witness would not be available on the date set for trial and that defendant was in custody and the 120-day term would expire by a new trial date. The State's Attorney further orally advised the trial court that another witness would also be unavailable until December 4, as he was in police training, and suggested that date for trial; December 4 was two days past the 120-day term in that case. The trial court granted the continuance and on December 4 denied defendant's motion for discharge. The reviewing court affirmed on appeal, finding there were differences which removed the case from the narrow confines of *Toolate*. The court noted the State's motion had referred to section 103—5 and that the trial court was aware the continuance would extend beyond the 120-day term. It found from the record the State had exercised diligence in keeping contact with the witnesses and that the trial judge was satisfied that granting the motion was not for any reason other than interests of justice and did not prejudice defendant. The reviewing court considered the purposes of the statute would not be well served if the State was required to follow a rigid format in obtaining a continuance under section 103—5(c).

In *People v. Young* (1981), 97 Ill. App. 3d 187, 423 N.E.2d 221, *appeal denied* (1981), 85 Ill. 2d 561, the State's motion for continuance of trial referred to both sections 103—5 and 114—4 in seeking a continuance because of the absence of a material witness from the country. The State also informed that trial court the witness would return just one day prior to expiration of the 120-day term. The reviewing court noted the State had presented its justifications for the continuance in terms of due diligence, "the operative test for a section 103—5(c) continuance" (97 Ill. App. 3d 187, 190) and that temporary absence of a material witness from the country was a valid ground for a section 103—5(c) continuance. The court further noted that allegations of due diligence need not be presented by affidavit, but may be made orally. 97 Ill. App. 3d 187, 190.

Most recently, in *People v. Garrett* (1982), 104 Ill. App. 3d 178, 432 N.E.2d 1305, *appeal denied* (1982), 91 Ill. 2d 574, the court considered a similar general motion for continuance, as in the present case, which also did not designate whether it was brought under section 103—5 or 114—4. Defendant opposed the continuance, but the trial court granted the motion "in accordance with Section 114—4(c)(2)" and set the case for trial on the September docket. On September 10 defendant moved for discharge, alleging the speedy-trial term had expired September 8, to which the State responded that its earlier motion for continuance had acted to extend the term. After a hearing, the trial court denied defendant's motion for discharge and

made findings: (1) the prosecution had exercised due diligence in obtaining material evidence; (2) there were reasonable grounds to believe the evidence would be available later; (3) the continuance had been granted pursuant to section 103—5(c), and the case came on for trial within the maximum period of extension provided by section 103—5. On appeal, defendant relied upon *People v. Toolate,* arguing the State had failed to request an extension of time under section 103—5(c) at the time of its motion for continuance and the speedy-trial term was not extended. The reviewing court distinguished *Toolate,* as the trial court had subsequently made findings that the State exercised due diligence to obtain the evidence and that it would be available at a later date if the time was extended. The State had indicated to the trial court the missing witness would be gone for the month of August and implied he would be back in September. The reviewing court noted that after the continuance was granted trial commenced only one week into the extended period.

In our view, the essential requirements of section 103—5(c) in order to permit extension of the 120-day period within which a defendant's trial must commence are showings by the State it has diligently sought, without success, to obtain material evidence within the term and that such evidence will be available at a later day. The pathologist who would be out of the country and the detective who was to be on his honeymoon clearly offered material evidence when they subsequently testified in trial, the latter to a statement given by defendant. The record demonstrates the State's diligence in being informed of the unavailability of these witnesses for the August 22 trial date and knowing that they could appear for trial on the continued date of September 12. Neither defendant's trial counsel nor counsel on appeal have suggested these witnesses were not material to the case or that the State did not act diligently to secure their appearance at the original August 22 trial date. Contrary to defendant's argument, the trial court did exercise its discretion in granting the State's motion for a continuance on these grounds, expressing some consternation at the failure of the witnesses to advise of their plans and stating that would be the last continuance, unless by the defense should discovery not be completed.

The State's motion did not refer to either of the statutes relating to continuances, and the trial judge did not specify under which statute he was granting the continuance. Nor was the trial court advised at the August 19 hearing that the continuance would extend the trial date beyond the 120-day term. We do not consider these omissions to be dispositive, however, as the requirements of section 103—5(c) were met by the unrebutted motion and representations of the State and

the determination of the trial court granting the continuance to September 12, a time well within the extended period. See *People v. Arndt* (1972), 50 Ill. 2d 390, 393, 280 N.E.2d 230.

■ As we have determined the trial court did not abuse its discretion in granting the continuance on the record before it, defendant's present argument his trial counsel was ineffective for failing to seek his discharge is without merit. It seems apparent that defendant's trial counsel was aware the State's motion for a continuance was meritorious and that to have opposed it on August 19 or to have sought defendant's discharge on speedy-trial grounds after expiration of the initial 120-day speedy-trial term would have been futile. *People v. Callahan* (1981), 95 Ill. App. 3d 479, 481-82, 420 N.E.2d 787, *appeal denied* (1981), 85 Ill. 2d 568.

■ Defendant also contends his trial counsel was incompetent for failing to request that the blood samples taken from the murder scene and the gel in which blood samples were tested be preserved. He suggests that independent testing by defendant's expert witness may have determined the State's expert had incorrectly identified the blood enzymes found or may have found others by additional testing which might have excluded defendant as the offender or may have established that the blood on defendant's clothing did not come from the victim.

Defendant has not established he was prejudiced by any failure of his counsel to seek preservation of the evidence for independent testing. The test results obtained in the F.B.I. laboratory were inconclusive in that 50% of the black population have the same type of haptoglobin as does defendant and that found on certain of the exhibits, and 30% have the same type as did the victim. Defendant and the victim are both black. Defendant's argument that his expert may have reached conclusions from separate tests which would assist the defense is mere conjecture and insufficient to show actual prejudice. (See *People v. Hills* (1980), 78 Ill. 2d 500, 401 N.E.2d 523; *People v. Hambrick* (1979), 68 Ill. App. 3d 447, 386 N.E.2d 455, *appeal denied* (1979), 75 Ill. 2d 592.) Moreover, it cannot be said that the blood test evidence offered by the State, which defendant suggests his expert might have contradicted, had a significant role in defendant's conviction. Defendant placed himself at the murder scene by his own testimony and statements, and his hair samples and shoe print matched those found there. His testimony other men attacked the victim with a knife was rebutted. Defendant does not in this appeal challenge the sufficiency of the evidence to convict him of murder.

Defendant also notes other conduct by his trial counsel which he asserts evidences incompetence. We have considered the matters

raised and do not agree defendant was deprived of the effective assistance of counsel in the conduct of his defense. Competency is determined by an evaluation of the totality of counsel's conduct at trial. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437, 381 N.E.2d 677.) Counsel's performance here reflected preparation and thorough familiarity with the case. He skilfully examined the witnesses and in his argument to the jury carefully analyzed weaknesses in the State's case and attacked the credibility of the State's witnesses. His overall performance afforded defendant the standard of representation to which defendant was entitled under the sixth amendment of the Federal Constitution.

## II

Defendant argues, alternatively, that the State had a duty, in the absence of a defense request, to preserve the blood test evidence and failure to do so violated due process and undermined defendant's ability to confront the State's blood expert in trial.

As earlier discussed in this opinion, the blood sample evidence had little, if any, impact upon the outcome of the case, and it is entirely speculative on defendant's part that it may have assisted his defense to have separately tested it. In the absence of prejudice defendant's present argument lacks merit.

Furthermore, the State did not have an independent duty, in these circumstances, to preserve this evidence. Defendant relies upon *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573, and *People v. Dodsworth* (1978), 60 Ill. App. 3d 207, 376 N.E.2d 449. We do not consider these cases to support defendant as they relate to the independent duty of the State to preserve an alleged controlled substance which is the basis for a drug prosecution for further testing. Our supreme court recently rejected application of those decisions to noncontraband evidence where its exculpatory value is not apparent before it is destroyed. *People v. Jordan* (1984), 103 Ill. 2d 192, 209, 469 N.E.2d 569; see also *California v. Trombetta* (1984), 467 U.S. ___, 81 L. Ed. 2d 413, 104 S. Ct. 2528; *People v. Flatt* (1979), 75 Ill. App. 3d 930, 394 N.E.2d 1049, *vac. on other grounds* (1980), 82 Ill. 2d 250, 412 N.E.2d 509.

## III

■■■■ We next consider whether the evidence was sufficient to establish that defendant knew or had reason to know there was someone in his brother's house when defendant entered it. Defendant argues he had testified he believed no one was home, his brother's car was not in the driveway, and he notes the absence of evidence of

lights or television operating therein which could suggest someone was home. Defendant contends the proof was insufficient to establish this essential element of the offense of home invasion, requiring that conviction be reversed.

Home invasion occurs when a person who is not a peace officer without authority "knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present ***." (Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a).) In this case defendant was aware that the home he entered was the dwelling place of his brother, the brother's wife (decedent) and their children. The brother testified he had spoken to defendant outside a tavern at 12:45 a.m. that night; defendant was then aware the brother's wife and children were not with him. Defendant had lived in the apartment next to the Howard home, and there was testimony decedent usually went to bed at 10:30 or 11 p.m. and the Howard children were always home late at night. We find in these circumstances there was sufficient evidence from which the jury could conclude that defendant knew there was a substantial probability that another person or persons were present in the home when he entered it. (*People v. Davis* (1982), 106 Ill. App. 3d 260, 264, 435 N.E.2d 838; Ill. Rev. Stat. 1983, ch. 38, par. 4—5; *People v. Austin* (1984), 123 Ill. App. 3d 788, 463 N.E.2d 444.) Only where the verdict of a jury is so improbable or palpably contrary to the evidence as to raise a reasonable doubt of guilt will a reviewing court reverse it. *People v. Fox* (1983), 114 Ill. App. 3d 593, 597-98, 449 N.E.2d 261, *appeal denied* (1983), 94 Ill. 2d 554.

IV

■■■ Defendant next contends the sentence of natural life imprisonment imposed for his murder conviction was excessive and should be reduced. He asserts the sentence was based entirely on the nature of the offense and failed to give consideration to defendant's potential for rehabilitation as required by the Illinois Constitution of 1970, article I, section 11, and section 1—1—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1001—1—2).

Defendant was 20 years old when sentenced, alcoholic and addicted to drugs. He had been previously convicted of battery on two occasions, resisting arrest, misdemeanor theft and twice for robbery. Defendant served 364 days' imprisonment for the theft, but had been sentenced to probation for the robberies; he was on probation at the time of the present offenses. We note defendant has not challenged the trial court's finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (See

Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(1), (b).) He argues that his previous record was minor and notes he has a two-year-old son for whom he is concerned because the child's mother was using drugs and living with a drug dealer. Defendant also points to evidence he was high on drugs on the night of the killing, suggesting his drug and alcohol problems were given inadequate consideration by the trial court.

It is clear from the record of the sentencing hearing that the court carefully considered all of the statutory factors in mitigation and aggravation before imposing sentence (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—5—3.1, 1005—5—3.2) in an effort to balance the goal of restoring defendant to useful citizenship with the requirement that the penalty be determined in accordance with the seriousness of the crime. The court found defendant's testimony at trial to be untruthful, that he lacked remorse, and it rejected the mitigating factors that defendant's conduct was unlikely to recur or that he was unlikely to commit another crime. We conclude the trial court did not abuse its discretion in finding defendant was beyond rehabilitation in imposing a natural life sentence. *People v. La Pointe* (1981), 88 Ill. 2d 482, 489-90, 494, 501, 431 N.E.2d 344.

■■ Defendant also contends the trial court erroneously considered reports of the nature of his prior robbery convictions which do not appear in the record of this case. The trial judge stated in reviewing defendant's prior record that in committing battery he had struck a person on the head and that the two robbery victims had been women, one of whom defendant had struck with his fist. Defendant cautions that a trial court must exercise care to insure the accuracy of information relied upon in imposing sentence and urges the case be remanded for a new sentencing hearing. *People v. Hayes* (1973), 55 Ill. 2d 78, 302 N.E.2d 37.

It is evident from the record that at the commencement of the sentencing hearing the trial judge had before him a presentence report relating to defendant dated January 26, 1982, prepared when he was sentenced for robbery. The report was made available to both defendant and the State and was discussed on the record with defense counsel as to accuracy. Counsel then made no objection to this procedure, and defendant does not now question the accuracy of the matters referred to by the trial court.

A sentencing judge has wide discretion in considering evidence to assist him in determining sentence (*People v. La Pointe* (1981), 88 Ill. 2d 482, 494-95, 431 N.E.2d 344), and reference to the facts relating to defendant's previous offenses contained in the earlier presentence report was proper in these circumstances. See *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261.

## V

■■ Defendant's final contention is that the extended term of 60 years' imprisonment imposed for home invasion was not authorized and should be reduced to a term of 30 years.

In *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, our supreme court considered section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)) and determined that a defendant who has been convicted of multiple offenses of differing classes may only be sentenced to an extended term for a conviction within the most serious class, and then only if that offense was accompanied by brutal or heinous behavior. (*People v. Jordan* (1984), 103 Ill. 2d 192, 206.) As defendant was here convicted of murder, a more serious offense than the Class X offense of home invasion, the extended 60-year term imposed for the latter must be reduced to conform to the requirements of the sentencing statute.

Accordingly, the judgment of the circuit court will be affirmed, except that the sentence imposed for home invasion will be reduced to 30 years, the maximum term authorized under section 5—8—1(a)(3) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(3)) for a Class X felony.

Affirmed as modified.

LINDBERG and REINHARD, JJ., concur.