THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GREGORY SLEBODA, Defendant-Appellant.

Second District   No. 2—86—0689

Opinion filed February 22, 1988.—Rehearing denied March 11, 1988.

G. Joseph Weller, Kerry Evan Saltzman, and Robert C. Cooper, all of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Virginia M. Ashley, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant was indicted on three counts of leaving the scene of an accident involving death and three counts of reckless homicide. Two trials were held. In the first, the jury found defendant guilty of the three counts of leaving the scene of an accident involving death, but the jury was unable to reach a verdict on the reckless homicide counts. At the second trial, defendant was found guilty of the reckless homicide charges. Defendant was sentenced to concurrent sentences of 364 days on each conviction for leaving the scene and four years on each conviction for reckless homicide.

At sometime in the early morning of December 8, 1982, defendant was involved in an accident involving defendant's car and two other automobiles. The occupants of the two other cars, three in all, all died as a result of the accident. After the accident, defendant walked to his home in Hillside and once there attempted to cut his wrists. Both

policemen and firemen from Hillside went to defendant's house in response to a call from defendant's sister. From there, the police officers took defendant to the Hillside police department. Later that morning, defendant was transferred to the Oak Brook police department and taken to a hospital for a blood test.

## MOTION TO SUPPRESS STATEMENTS

Prior to trial, defendant made a motion to suppress statements claiming that at the time he made the statements he was intoxicated to such an extent that he could not knowingly waive his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

Various police officers from the Hillside and Oak Brook police departments testified as to defendant's condition on the morning of December 8, 1982. While the officers testified that defendant had the odor of alcohol on his breath and staggered or swayed on occasion, they also testified that he was able to stand and walk on his own power, was able to follow directions, and was responsive to questions. In particular, Officer D'Alessandro testified that before leaving defendant's house, defendant assured his sister he would be all right and likewise told his father not to worry and that he would be okay. Officers D'Alessandro and Artl further testified that defendant was read his *Miranda* rights and after each right asked if he understood to which defendant responded that he did.

Several times during that morning defendant inquired about the people involved in the accident, at times asking if they were all right and at other times asking if they were dead.

Officer Artl, who took defendant from the Hillside police department to the Oak Brook police department, testified as to statements made during that trip. Defendant stated, "There's no way I could have caused the accident. I didn't go over the median strip." Defendant also stated that he had been challenged to a drag race at the intersection of Buck and Roosevelt Roads, that he traveled westbound on Roosevelt Road from Buck, and that the cars were going too fast.

On several occasions, defendant was asked if he desired medical treatment. He declined until he was informed that he could receive treatment without insurance, at which point he said he would go along with that.

On the way to the hospital, defendant again described a drag race and the other vehicle involved.

Evidence at the hearing was also presented that defendant submitted to a breathalyzer test which resulted in a reading of .22.

Defendant testified that between 6:15 and 7 a.m. on December 8, 1982, he was in the outer room of his bedroom drinking beer. Defendant said he drank eight beers "or more or less." He said that the next thing he remembered was talking to his attorney on the phone at the hospital.

Yoerge Pirl, assistant chief toxicologist for the State of Illinois Department of Public Health, testified on defendant's behalf. Pirl testified that at a blood level of .22, an individual would suffer severe perception and motor impairment. He added that whether an individual understands a given question is a matter of degree and that a person may or may not understand the short-term effects of that question. He stated that "frequently," at levels of .25, long-term consequences are not realized. He stated that such a person may or may not understand communication and that it is a difficult subject matter to judge. When given a hypothetical question concerning a person's ability to understand and waive his *Miranda* rights, Pirl stated that he could not state with certainty whether the individual could or could not comprehend the statements. According to Pirl, alcohol and its effects differ from person to person.

Dr. Edward Senay also testified on defendant's behalf. Senay testified that, based on reports which had been submitted to him, defendant's ability to make judgments was impaired at least to a mild degree, more probably to a moderate or severe degree.

At the close of the hearing, the trial court denied defendant's motion to suppress statements.

HEARING ON MOTION TO DISMISS THE INDICTMENT

Defendant made a motion to dismiss the indictment on the ground that automobiles involved in the accident had been destroyed before an expert for defendant could view them. At the hearing on this motion, the parties stipulated that if Albert Ceren were called to testify he would state that he was the chief of the Oak Brook police on the relevant dates. He would testify that certified letters were sent over his signature on January 31, 1983, notifying the families of John Czernia and Roberta Jackson that if storage and towing fees were not paid and the cars not picked up within 10 days, they would be disposed of. He would further testify that the Cordoba belonging to John Czernia and the Duster belonging to Roberta Jackson were released to the Diehl-Nuemier Scrapyard Company on February 16, 1983. The parties further stipulated that the cars were not available.

Charles Roberts, Jr., testified that he performs accident reconstruction and failure analysis as a consulting engineer and was first

contacted by the defense in March 1983. Roberts said that he could not perform a failure analysis from available photographs of the vehicle. According to Roberts, he could have conducted a failure analysis on the vehicles despite the extent of damage and that, if he had done so, he had a 70% to 80% chance of finding a failed part, if one did exist.

Mark Komessar, one of defendant's attorneys, testified that an order for reciprocal discovery was entered on January 10, 1983, that he had received materials from the State dated January 31, 1983, that the discovery materials indicated that tangibles could be viewed at the State's Attorney's office and that he correlated that to mean he could view the vehicles referred to in the police reports. Komessar further stated that on February 7, 1983, he appeared before the court for status on discovery and at that time had an off-the-record discussion with State's Attorney Schillerstrom in which he made a request to view the vehicles.

Edward Merkel testified that he was five car lengths in front of the Cordoba, in the center lane, when he saw the left front of the Cordoba go down. Merkel stated that the other three corners went up and he noticed some sparks underneath the left front. Merkel said that the Cordoba went out of control, hit the center median and flew up in the air about two feet off the street. Thirty seconds later, Merkel heard an impact. Merkel indicated that he did not see anything come off the Cordoba when he saw it drop down.

At the conclusion of the hearing, the trial court denied defendant's motion to dismiss.

### DEFENDANT'S SECOND TRIAL

Oak Brook police officer Allen Pisarek testified that he investigated the accident scene by measuring the location and final resting position of the automobiles along with various markings on the road which he plotted on a scaled diagram which was shown to the jury.

Oak Brook police officer Vincent Artl testified that on the morning of December 8, 1982, he took defendant from the Hillside police station to the Oak Brook police station. While on the way, Artl noticed a strong odor of alcohol. Artl asked defendant if he had had any food or alcohol since the time of the accident to which defendant responded that he had not. As the officers drove on Buck Road, defendant asked whether there were really three people killed. When Artl said yes, defendant stated it could not have been him because his vehicle did not cross over the median strip. Defendant also related that while stopped at a red light at Buck and Roosevelt Roads he was chal-

lenged to a drag race, that he started to drag race in a westerly direction on Roosevelt Road, that he was going very fast and hit something, and that he walked home.

When questioned at the Oak Brook police station, defendant said he had had a lot of beer to drink the night before. Defendant said he started drinking at his girlfriend's house in the early afternoon, that he went to Bobby's Bar at 9 p.m. and drank there until midnight, that he went to the D & S Bar and drank until 2 a.m., that he then went to Fay's Place and was drinking there until he left to go to his girlfriend's house.

On the way to the hospital where defendant was taken for a blood test, he was asked if he remembered anything else about the accident. Defendant said that the other vehicle was a black car, that the vehicle pulled out in front of him quite a bit, that he was trying to catch up to the vehicle when he suddenly hit the rear end of it, that he did not know the other driver and that this was not a preplanned drag race.

Officer Rail testified that in response to questioning, defendant stated that in the last three hours he had been drinking Strohs beer. It was Rail's opinion that at the time of questioning defendant was very intoxicated. On cross-examination, Rail testified that defendant stated that he began drinking at 2 p.m. on December 7. Defendant further stated that he had had "enough" to drink.

Oak Brook police officer Allen Borkevec testified that he administered a breathalyzer test to defendant and the result of that test was .22.

Edward Seagl, formerly Edward Merkel, testified that he was traveling on I-290 when he observed a dark-colored Chrysler traveling in front of him. After both cars exited onto Roosevelt Road, Seagl passed the Chrysler. He did not see any headlights from other cars. Seagl did not notice anything unusual about the operation of that vehicle. Seagl testified that he was traveling at about 55 or 60 miles per hour. After passing, Seagl looked in his rearview mirror and observed that the left front end of the Chrysler fell to its left side and sparks came from underneath the car. The car went straight for a few seconds and then veered to the left and went over the median. This took place in 5 to 10 seconds. The left front hit the median, and the car then went airborne. Seagl could only see the shadow of the car flying onto the other side of the road. On cross-examination, Seagl testified that he never saw the Chrysler involved in a drag race.

Jacqueline Testa, defendant's sister, testified that on December 8, 1982, at approximately 7:30 a.m., she observed defendant in his downstairs bedroom on his bed. Defendant did not respond to her when she

called him. He had blood on his wrists and face. Testa saw a knife lying on the floor right below defendant. Testa went upstairs and called the paramedics.

Herman DeLawter, fire fighter and emergency medical technician, testified that he responded to a call at defendant's residence on December 8, 1982, at 7:44 a.m. DeLawter saw defendant lying facedown across his bed at an angle, as if defendant were asleep. He observed rough, slight, perpendicular lacerations across defendant's wrists and dried blood on defendant's forehead and wrists. At the edge of the bed, DeLawter found a serrated knife lying on the floor. He opined that the slash marks did not look like they could have been sustained in a car accident, but were consistent with slicing from a serrated steak knife.

The parties then stipulated that on December 8, 1982, at 9:52 a.m. defendant's blood test showed a blood-alcohol level of .25.

The State next called Daniel J. Brown, assistant chief forensic toxicologist for the Illinois Department of State Police. Brown testified that the breathalyzer consistently reads lower than a blood test and that the results of defendant's tests did not necessarily indicate that his blood-alcohol level was rising. He further stated that a person would have to consume 10 to 12 beers between 6:30 a.m. and 7:30 a.m. in order to have a breathalyzer reading of .22 at 8:50 a.m.

Greg W. Caulton, a professional engineer, testified as to the matching damage in the pictures of the Pontiac and Cordoba. He estimated the closing speed (difference in speed) between the two vehicles was 40 miles per hour. Caulton described how the Pontiac's left front bumper underrode the Cordoba rear bumper, lifting the rear up and tending to make the left front corner dip downward. The Pontiac rotated the Cordoba and turned it to the left. It was possible that something on the left front corner of the Chrysler dipped low enough to scrape on the pavement. According to Caulton, the Cordoba would not have been able to cross the median at a speed of less than 50 miles per hour. He also stated that if there had been a failure of a component part, the front end would stay down close to the road and the car would not have been able to jump the eight-inch curb. On cross-examination, Caulton said that if the Cordoba had traveled in a straight line for 5 to 10 seconds, there was a possibility that a mechanical failure caused the Cordoba to dip down. On redirect examination, Caulton stated that Seagl's direct testimony, that the Cordoba went straight for a few seconds and suddenly veered to the left, was consistent with his description of the accident.

Oak Brook Officer Rail testified that during questioning from the

alcoholic influence report, defendant told him that he had been drinking beer for the last three hours. However, defendant also told Rail that he had been drinking since 2 p.m. the previous day.

Defendant's expert, Charles Roberts, testified that he could not conduct a failure analysis from available photographs, nor determine the actual speed of the vehicles. Roberts said that if the point of impact was when the Cordoba dropped down or just prior to dropping down, he would expect the Cordoba to go left immediately in a counterclockwise rotation. Roberts said that it was still possible to calculate closing speed. Roberts said that he had a 70% to 80% chance of finding a failed part if, in fact, one did exist before the accident. He said there was no indication that a mechanical defect existed, but if the Cordoba were seen to go straight for 5 to 10 seconds it would not be consistent with the vehicle having been struck in the manner described by the prosecution.

Defendant testified that he arrived at his girlfriend's (Paula Pein) house on the afternoon of December 7, 1982. He left there around 4:30 p.m. and drove home, where he ate dinner with his family. According to defendant, he had nothing to drink of an alcoholic nature during dinner. At approximately 9 p.m., defendant left home to go back to Pein's house. On the way, defendant stopped at Bobby's Lounge in Berkeley, Illinois, and inquired about purchasing a bar light. He did not have a drink at Bobby's Lounge. He then stopped at the D & S Lounge in Bellwood, Illinois, for the same reason and had one beer. After 20 minutes, defendant left and arrived at Pein's home at 10 or 10:30 p.m., but did not have anything to drink there. Between 1 and 1:30 a.m. he left Pein's and went to a bar in Stone Park, Illinois, called Fay's Place to inquire about a bar light. Defendant did not have a drink at Fay's. After 10 to 15 minutes at Fay's, defendant drove home to sleep. According to defendant, Pein telephoned him at 5 a.m. so that he could take her to work. Defendant left for Pein's, taking Mannheim Road to the I-90 expressway westbound. Defendant said he exited westbound on Roosevelt Road, traveling between 50 and 60 miles per hour. Defendant claimed that he was traveling in the far right lane when another car slid into his lane. Defendant then remembers hitting the car. After striking the car, defendant remembers trying to start his car, which was in the westbound ditch at the time. Upon arriving home, defendant called Pein to tell her he could not make it. After speaking to Pein, defendant had a few beers. Defendant said he drank six or more beers. The next thing he remembered was waking up in a hospital. Defendant denied being in a drag race at any time prior to the accident. Defendant stated that he normally did

not drink in the morning but did on this occasion because he had smashed his car, his girlfriend was yelling at him, and his head hurt real bad.

On cross-examination, defendant stated that he did not remember telling the police that he had been involved in a drag race. Defendant also stated that both Bobby's and D & S were in the opposite direction from Pein's, and that Fay's was 2½ to 3 miles past his house coming from Pein's. Defendant also stated that it was about three miles from the accident to his house.

Paula Pein testified that on December 7, 1982, she received a telephone call from defendant at 9 p.m. during which he said he would be over shortly. Defendant arrived at 10 or 10:30 p.m. and was not intoxicated. Neither drank that night, and defendant left at 1 or 1:30 a.m. She telephoned defendant at 5 a.m. at his home, and defendant indicated that he was going to come over and pick her up to take her to breakfast and then to work. She had earlier testified that she began work at 8 a.m. and that it took about 15 minutes to get to work by car. Defendant called her at 6:30 a.m. to say that he was not coming since he had been involved in an accident and his car would not start.

I

■ Defendant first contends that the trial court erred in failing to suppress alleged statements made by defendant at the time of his arrest because defendant, at that time, was not competent to knowingly waive his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. We disagree.

In *People v. Roy* (1971), 49 Ill. 2d 113, our supreme court held that a defendant had not understandingly waived his *Miranda* rights due to the fact that he was intoxicated. However, evidence of intoxication by itself will not render a waiver involuntary. (*People v. Moon* (1976), 38 Ill. App. 3d 854, 860.) Rather, the evidence must plainly show that a defendant is so grossly intoxicated that he no longer has the capacity to knowingly waive his rights. (38 Ill. App. 3d at 860.) Where the evidence is not clear, the fact that a defendant was intoxicated does not make his statement inadmissible. (38 Ill. App. 3d at 860.) With regard to whether a defendant was so intoxicated as to make his statements involuntary, the decision of a trial court will not be reversed unless it is against the manifest weight of the evidence. *In re Shutters* (1977), 56 Ill. App. 3d 184, 188.

■ In the instant case, we find that the decision of the trial court was not against the manifest weight of the evidence. While there can be no doubt that defendant was intoxicated, the evidence was suffi-

cient to show that his waiver was knowingly made. There was evidence that showed defendant was able to stand and walk unassisted, was responsive to questions, was able to follow directions, did not have slurred speech, showed concern for both his sister and father, and showed an awareness of the accident.

The instant case is thus distinguishable from *Roy* where the defendant kept saying "What?" in response to a reading of his rights, was swaying, and was very confused. (*Roy*, 49 Ill. 2d at 114-15.) Moreover, unlike the instant case, the defendant in *Roy* never said that he understood the warnings. 49 Ill. 2d at 115.

We therefore hold that the trial court did not commit reversible error in failing to suppress statements made by defendant.

## II

■ Defendant next contends that he was denied due process due to the fact that the Chrysler Cordoba involved in the accident was destroyed before defendant's reconstruction expert was allowed to examine it. Defendant argues that based on Seagl's eyewitness account there is strong reason to believe that the accident was due to mechanical failure in the Chrysler instead of recklessness on the part of defendant. Defendant also contends that under *People v. Taylor* (1977), 54 Ill. App. 3d 454,. the State has an affirmative duty to preserve evidence so that independent tests may be made by the accused.

The broad position that defendant espouses is misplaced. Our courts have continually distinguished *Taylor*, finding it only applicable to destruction of controlled substances. (*E.g., People v. Jordan* (1984), 103 Ill. 2d 192, 211; *People v. Howard* (1985), 130 Ill. App. 3d 967, 978.) More importantly however is the Supreme Court's decision in *California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528, which was decided after *Taylor*. In *Trombetta* the Court addressed the issue of whether due process requires the State to preserve potentially exculpatory evidence on behalf of defendants. The Court stated:

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. *** [E]vidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 488-89, 81 L. Ed. 2d at 422, 104 S. Ct. at 2534.

In *Jordan* our supreme court applied *Trombetta* and held that

there was no violation of due process where the remains of the victim's body were examined by a coroner and then returned to the family, who subsequently had the remains cremated. (*Jordan,* 103 Ill. 2d at 212.) The court stated:

> "As in *Trombetta,* there is nothing in the record here to indicate that the State's actions were designed to defeat its duty of disclosure under *Brady.* The State did not destroy the jaw to deliberately suppress exculpatory evidence; rather, it returned the jaw to the family pursuant to a statutory mandate." (103 Ill. 2d at 212.)

Thus, under *Trombetta* and *Jordan* a defendant must show that the evidence possessed exculpatory value that was readily apparent in order to show that there has been a due process violation.

However, it is notable that neither *Trombetta* nor *Jordan* address what need be shown where there is a request for specific evidence. In such a case, we do not believe that a defendant should have to show that the exculpatory value of the evidence was readily apparent since the specific request puts the State on notice to preserve the evidence. See *People v. Vargas* (1983), 116 Ill. App. 3d 787, 793 (where there is a specific request, showing that exculpatory value was readily apparent is not a requirement); *People v. Ruffalo* (1979), 69 Ill. App. 3d 532, 536-37 ("[W]ithholding requested evidence, a bad faith action, constitutes denial of due process simply because evidence was requested and withheld, without regard to the nature of the evidence").

■ However, in the instant case, the record discloses that the only evidence of a specific request to view the cars was at the hearing on defendant's motion to dismiss the indictment. At that hearing, there was unrebutted testimony by Komessar, defendant's attorney, that on February 7, 1983, Komessar had a discussion with the State in which he requested to set up a time to view the automobiles. However, we find that because the alleged request was oral it was insufficient under Supreme Court Rule 412, which provides for discovery upon written request. (107 Ill. 2d R. 412.) Moreover, we find that policy considerations also require a written request or a request made on the record. Such considerations include the fact that an oral request which is made off the record is more easily overlooked by the recipient of the request; the specificity of the request may be difficult to determine at a later date when compliance is being questioned; and with a written request or request made on the record, proof of such a request will be far more certain. And, whereas dismissal of an indictment may be proper where a defendant has done everything in his power to protect his interests, such a remedy does not seem appropri-

ate where a defendant has failed to meet the basic requirements for discovery under our supreme court rules. Thus, we find that there was no specific request for due process purposes and that defendant was thus required to show that the exculpatory value of the Cordoba was readily apparent to the State. See *Trombetta*, 467 U.S. at 488-89, 81 L. Ed. 2d at 422, 104 S. Ct. at 2534; *Jordan*, 103 Ill. 2d at 211; *Howard*, 130 Ill. App. 3d at 978.

■ In the instant case, defendant's expert testified that there was a 70% to 80% chance of finding a defect if one existed. However, he could not make his determination from the photographs of the Cordoba. Thus, this testimony does not reveal that the Cordoba was in fact exculpatory but merely that there was a chance that it might be exculpatory. This testimony does, however, indicate that its exculpatory value would not have been readily apparent to the State for if an expert could not tell from photographs whether or not a defect existed it is highly improbable that the police (nonexperts) could determine that the Cordoba was exculpatory when they would have viewed the Cordoba in essentially the same way it was depicted in the photographs. Consequently, we hold that the State was under no duty to preserve the Cordoba in the face of a general discovery order, and that as a consequence the trial court did not err in denying defendant's motion to dismiss the indictment.

### III

■ Defendant next contends that the prejudicial effect of admitting defendant's nine-year-old burglary conviction outweighed any probative value the record could have had for impeaching defendant's credibility. We disagree.

Our supreme court has adopted Rule 609 of the Federal Rules of Evidence. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 519.) Under such rule, evidence of prior crimes may be admitted to impeach a witness if the prior crime was punishable by imprisonment in excess of one year or was a crime which involved dishonesty. (47 Ill. 2d at 516.) Convictions for serious felonies are considered to be probative of an individual's credibility because they evince a disrespect for societal order and thus adversely affect a witness's veracity. (See *People v. Medreno* (1981), 99 Ill. App. 3d 449, 452.) Once the proponent of the impeachment has shown that the crime was either punishable by imprisonment in excess of a year or involved dishonesty, the burden is upon the party opposing the impeachment to show that the evidence is more prejudicial than probative. (99 Ill. App. 3d at 451.) The exer-

cise of discretion inherent in the rule rests with the trial court. 99 Ill. App. 3d at 452.

In the present case, we find nothing to indicate that the trial court's ruling was an abuse of discretion. We therefore hold that the trial court did not err in admitting defendant's prior burglary conviction.

## IV

■■ ■ Defendant next contends that the evidence presented at the second trial did not prove defendant guilty beyond a reasonable doubt. We disagree.

A person commits reckless homicide when he unintentionally kills a person while driving an automobile and the acts which caused death are performed recklessly so as to create the likelihood of death or great bodily harm to some person. (*People v. Gittings* (1985), 136 Ill. App. 3d 655, 659.) Reckless conduct occurs when an individual consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to some individual and where such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in such a situation. (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 931.) Among other things, conscious disregard of a substantial or unjustifiable risk may be shown through the physical condition of the driver. (*People v. Davis* (1982), 105 Ill. App. 3d 129, 133.) Evidence of a driver's intoxication is probative of recklessness. (105 Ill. App. 3d at 133.) Improperly driving an automobile while intoxicated may constitute reckless conduct. 105 Ill. App. 3d at 133.

In *Davis*, the court held that recklessness had been proved where there was evidence of intoxication and a reconstruction expert testified that the impact of the accident had occurred in the lane traveling in the opposite direction of the lane in which defendant was traveling. 105 Ill. App. 3d at 133.

■ In the present case, there was certainly sufficient evidence to indicate that defendant was intoxicated at the time of the accident. Defendant and the State stipulated that at 9:52 a.m. he had a blood-alcohol concentration of .25. Despite defendant's argument that the testimony established that he was sober at the time of the accident and only became intoxicated after the accident, there was sufficient evidence to lead the jury to the conclusion that he was intoxicated at the time of the accident. To begin with, Officer Artl testified that defendant himself stated he had been drinking prior to the accident and had not had anything to drink after the accident. Moreover, the

jury is the determiner of the credibility of witnesses and, therefore, was free to disregard the testimony of defendant and his girlfriend, Pein. In addition to the obvious bias of these two individuals, it is apparent that the testimony of these two stretched the bounds of believability in several respects. The accident occurred sometime after 5:20 a.m. According to defendant, he walked home after the accident (a distance of approximately three miles) and then drank six or more beers. According to defendant, he drank beer at that time because he smashed up his car, his girlfriend was yelling at him, and his head hurt real bad. Keeping in mind that Pein testified that defendant called her at 6:30 a.m. and defendant's sister testified that she found defendant unconscious at 7:30 a.m., defendant would have us believe that he called Pein, consumed six or more beers (enough to have a blood-alcohol level of .25 at 9:52 a.m.), cut his wrist, and fell into a deep sleep within a one-hour time span. It is difficult to believe that anyone would drink that much in the early morning when his head hurt and equally inconceivable that anyone would drink as much as defendant alleges he did in the short period of time that he had. Defendant's story is even more incredible when compared with the testimony of Daniel Brown, a forensic toxicologist. Brown stated that to have a blood-alcohol level of .22 at 8:50 a.m., a man drinking between 6:30 and 7:30 a.m. would have to consume 10 to 12 beers.

Moreover, defendant's stated reason for being out at 5:20 in the morning was because his girlfriend called him at 5 a.m. (after leaving her at 1:30 a.m.) to take her to work at 8 a.m. Although, according to Pein, they were to have had breakfast first, the time sequences are so improbable as to be unbelievable. Therefore, the jury could have been well entitled to disregard the testimony of both defendant and Pein.

▓▓ Defendant further argues that it was reasonable to believe that the accident was due to a mechanical failure in the Chrysler. However, the State's expert witness testified that if there had been a failure of a component part, the car would not have been able to jump the median strip. And, based on Caulton's testimony, the jury could have concluded defendant was traveling at 90 miles an hour at the time of the accident (speed Cordoba would have to be at to jump curb, 50 miles per hour, plus closing speed (the speed difference between the Cordoba and defendant's car), 40 miles per hour). Finally, the testimony of Seagl that he saw the lights of the Chrysler, but no other lights leads to the conclusion that defendant was driving without his headlights on. In addition to evincing reckless conduct in itself, this action would further support a conclusion that defendant was intoxicated at the time of the accident. From the expert's testimony, com-

bined with the evidence relating to defendant's intoxication, we find that the jury could have concluded that defendant failed to keep a proper lookout.

We therefore hold that there was sufficient evidence to prove defendant guilty beyond a reasonable doubt.

## V

■■ Defendant finally contends that the trial court erred in entering judgment on three convictions of leaving the scene of an accident involving death. Defendant argues that because he was only involved in one accident he could be convicted only once for leaving the scene of an accident involving death. We agree.

Section 11—401 states in pertinent part:

"(a) The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible and shall then forthwith return to, and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 11—403." (Ill. Rev. Stat. 1981, ch. 95½, par. 11—401.)

Section 11—403 in turn provides:

"The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle which is driven or attended by any person shall give his name, address, and registration number of the vehicle he is driving and shall upon request and if available exhibit his driver's license to the person struck or the driver or occupant of or person attending any vehicle collided with and shall render to any person injured in such accident reasonable assistance, including the carrying or the making of arrangements for the carrying of such person to a physician, surgeon or hospital for medical or surgical treatment, if it is apparent that such treatment is necessary or if such carrying is requested by the injured person.

If none of the persons entitled to information pursuant to this Section is in condition to receive and understand such information and no police officer is present, such driver after rendering reasonable assistance shall forthwith report such accident at the nearest office of a duly authorized police authority, disclosing the information required by this Section." Ill. Rev. Stat. 1981, ch. 95½, par. 11—403.

We find that the statute itself indicates that an individual can only be convicted once for leaving the scene of one accident since the focus

is on remaining at the scene of the accident. Moreover, section 11—401 requires the fulfillment of obligations under section 11—403, which in turn refers to *"persons* entitled to information." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 95, par. 11—403.) Thus, the statute itself recognizes that there may be several persons involved in one accident. Therefore, while there may be several persons injured in an accident, there is only one accident scene at which the driver has a duty to remain. Consequently, we hold that the court erred in entering judgment on three counts of leaving the scene of an accident involving death. We therefore reverse counts V and VI.

Affirmed in part and reversed in part.

UNVERZAGT and NASH, JJ., concur.