THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANK SANTIAGO, Defendant-Appellant.

First District (2nd Division)   No. 1—88—1615

Opinion filed November 12, 1991.

David S. Mejia, of Oak Park, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Kenneth T. McCurry, and David Meyerson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McCORMICK delivered the opinion of the court:

Defendant was arrested and charged with the murder of Margarita Davila. Prior to trial, defendant filed a motion to suppress his oral statement and a motion *in limine* to preclude the State from admitting the statement into evidence.

In the motion to suppress, defendant alleged that he had been drinking at the time of his arrest and that he was so intoxicated that he was unable to voluntarily answer any questions posed to him by the arresting officers or the assistant State's Attorney. In the motion *in limine*, defendant alleged that by refusing his defense counsel's request that defendant be given a breathalyzer exam shortly after his arrest, the assistant State's Attorney prejudiced defendant's ability to corroborate and confirm his claim that he was intoxicated at the time he made his oral statement. Defendant asserted that, therefore, the State should not be allowed to use the statement against him.

At the hearing on defendant's motion, the State called Chicago police officers Kenneth Trempe, John Enault, and Richard Schak as witnesses. Officer Trempe testified that on the evening of April 18, 1987, he arrested defendant at a bar located at 2525 West Division in Chicago and took him to the 14th District police station. Trempe testified that he advised defendant of his *Miranda* rights at the time of his arrest and that defendant indicated that he understood and that defendant did not make a statement at that time.

Officers Enault and Schak testified that they later transported defendant from the 14th District police station to Area 5 violent crimes. Enault testified that he advised defendant of his *Miranda* rights after placing him in a police car at the 14th District station and that defendant responded that he understood them. Schak testified he

also advised defendant of his *Miranda* rights after placing defendant in an interview room at Area 5 and that defendant indicated that he wanted to make a statement at that time.

Officers Trempe, Enault, and Schak all testified that defendant appeared sober, he was not disheveled and had no difficulty walking or talking, his eyes were not bloodshot, and they did not notice an odor of alcohol on him. They all also testified that after they advised defendant of his rights, he asked them several questions.

Bruce Edenson was called on behalf of defendant. Edenson, a friend of Marvin Leavitt, defendant's attorney, testified that on the night of April 18 he accompanied Leavitt to an address on West Division Street in Chicago, where they picked up Sally Rivera. The three then drove to a police station where they observed defendant being led into an interview room. Edenson stated that he was six to seven feet away from defendant at the time and that defendant appeared to be drunk.

According to Edenson, defendant was swaying and staggering, his eyes were very bloodshot, and there was an odor of alcohol on his breath or his person. Edenson testified that Leavitt requested that a breathalyzer test be performed on defendant, but an assistant State's Attorney refused to conduct the test.

Sally Rivera testified that she was a legal secretary and that she and her husband owned the bar where defendant was arrested. Rivera also testified that defendant was a friend of her husband, that she had known defendant for four or five years and that her brother was an associate at Leavitt's law firm.

Rivera testified that on the evening of April 18, defendant came into her bar around 10:30 p.m. and that he appeared to be drunk. Rivera stated that defendant told her that he had had a fight with his wife and that he had a gun. After taking the gun from defendant, Rivera drove to where defendant used to live, saw several police officers, and returned to the bar. Defendant was no longer at the bar when she returned, so Rivera went to her home, where she telephoned Leavitt. Leavitt later arrived at Rivera's home, along with Bruce Edenson, and the three drove to the police station.

At the station, Rivera saw defendant as he was being moved from one room to another. Rivera testified that defendant still appeared to be drunk at that time. Rivera further testified that she heard Leavitt request that a breathalyzer test be performed but that she did not believe that the test was done.

After the defense rested, it was stipulated that if Assistant State's Attorney Jack Bailey was called as a witness, he would testify

that he spoke with Leavitt in the early morning hours of April 19 and that Leavitt requested that a breathalyzer test be conducted on defendant. It was further stipulated that Bailey would testify that he responded that he would call his supervisor for permission and that shortly thereafter he indicated that he did not have authority and that the test would not be administered. It was also stipulated that Bailey would testify that, in his opinion, defendant was not under the influence of alcohol.

Following arguments, the trial court denied both of defendant's motions. The trial court found that while defendant may have been under the influence of alcohol at the time of his arrest, it did not appear that defendant was so intoxicated that he was unable to understand the *Miranda* warnings given by the police. Therefore, the court concluded that the State had met its burden of proving that defendant's statement was voluntary.

The trial court also found that despite defense counsel's request, the police had no obligation to give defendant a breathalyzer test. The court noted that at trial, defendant would be able to bring out the refusal to give the test as a factor in determining the weight to be given defendant's statement.

At trial, the State's first witness was Adalberto Beltran, the boyfriend of Miriam Devalle. Devalle was the daughter of Margarita Davila.

Beltran testified that on the evening of Friday, April 17, 1987, he was at Davila's apartment along with Devalle, Davila, and Davila's sister, Marisella Davila. Defendant arrived at the apartment shortly after Beltran, bringing with him a bottle of rum. According to Beltran, defendant had previously shared the apartment with Davila, and on that evening, he repeatedly told Davila that he wanted to come back.

Beltran further testified that the next morning, April 18, 1987, he made plans to take Davila and Devalle to dinner that evening. When Beltran arrived at Davila's apartment around 7 p.m., Devalle was present, but Davila was not. Defendant arrived an hour later and Davila a short time after that. When Davila arrived, defendant once again began telling her that he wanted to return to the apartment. Beltran also testified that defendant told Davila that "if she wasn't his she was going to be nobody's."

Beltran stated that around 9 p.m., defendant grabbed the bottle he had brought the previous evening and attempted to take a drink. Davila told defendant not to drink in the apartment and attempted to take the bottle away from him. Davila then told defendant to leave

the apartment, and defendant asked her why she wanted him to leave.

According to Beltran, defendant then told Davila "you don't mess around with me," pulled out a gun, placed it on the side of Davila's face, and shot her three times.

On cross-examination, Beltran denied that prior to the shooting, Davila told defendant that she did not love him and that she was seeing another man. Beltran also denied telling a police officer that defendant and Davila had argued over "infidelity."

Officer Kenneth Trempe was the State's next witness. Trempe testified that he arrested defendant at approximately 10:45 p.m. on the evening of the shooting, that he advised defendant of his *Miranda* rights and that defendant did not appear to be under the influence of alcohol at the time of his arrest.

Detective Richard Schak also testified on behalf of the State. Schak testified that after defendant arrived at the police station, he advised defendant of his *Miranda* rights and that defendant agreed to make a statement. According to Schak, defendant stated that he had gone to Davila's home in an effort to try to convince her that they should get back together and that Davila told defendant that she did not want to get back together with him. Defendant told Schak that when he reached to take a bottle of liquor from the kitchen counter, Davila grabbed the bottle and told him to get out of her apartment and not to come back. Defendant stated that he then reached into his hip pocket, pulled out a gun, and shot Davila in the head.

Schak testified that defendant never stated that he shot Davila because she told him that she was seeing another man. Schak further testified that defendant did not appear to be under the influence of alcohol at the time he made the statement.

The State's last witness was Dr. Edmond Donoghue, a forensic pathologist, who testified that he performed the autopsy on Davila. Dr. Donoghue testified that Davila suffered three gunshot wounds: one to the back of the head, one to the left side of the jaw, and one to the left side of the neck. According to Dr. Donoghue, the wounds to the back of the head and the left side of the jaw were contact wounds, meaning that at the time of firing, the gun was touching the skin. Dr. Donoghue also testified that the third wound showed evidence of near contact firing.

The defendant's first witness was Officer Sheila Magnus. Magnus testified that she was one of the officers who was called to the scene of the shooting. Magnus further testified that Beltran told her that,

just prior to the shooting, defendant had accused Davila of cheating on him.

Defendant's next witness, Sally Rivera, testified that about 10:15 p.m., on April 18, 1987, defendant came into her bar and told her that he needed to talk to her. Rivera stated that defendant appeared to be drunk when he approached her.

Rivera testified that she took defendant to a quiet spot in the bar where he told her that he thought he had shot his wife. Rivera told defendant that she did not believe him and asked to see the gun. Defendant took out the gun and gave it to Rivera. Rivera then left the bar and went to her home, where she telephoned Marvin Leavitt, defendant's attorney. Rivera then went to Davila's home, where a police officer told her that Davila had been killed.

Rivera returned to her home, where she again telephoned Leavitt. A short time later, Leavitt and Bruce Edenson picked up Rivera at her home and drove with her to the police station where she turned in the gun.

Rivera testified that she saw defendant while she was at the police station, and that defendant appeared to be in a daze and seemed to be in the same condition he was in when he walked into her bar.

Defendant testified in his own behalf. He stated that he met Davila in 1975 and that the two had lived together for 10 or 12 years. Defendant further testified that in 1985, Davila asked him to move out of the apartment they shared because of his drinking. According to defendant, he continued to have a relationship with Davila after he moved out of the apartment.

Defendant denied being at Davila's apartment on the evening of April 17, 1987. However, he testified that he was at the apartment the previous evening and that he spent the night there.

Defendant further testified that on the morning of April 18, he got up at 7 a.m. and went to a bar where he remained until 3 p.m. During that time, he consumed 10 to 12 beers and five or six hard drinks. Defendant then went to a restaurant where he ate lunch and had two more drinks. After leaving the restaurant, he went to Davila's apartment. Defendant testified that he had a gun with him when he went to the apartment and that he carried the gun frequently because he was "afraid of the streets."

Defendant testified that Davila, Devalle, and Devalle's boyfriend were present when he arrived at Davila's apartment. After speaking to Davila, defendant went into her bedroom, where he fell asleep for about two hours. When defendant awoke he began talking to Davila about returning home, and she responded that she did not want him

there because of his drinking. Defendant testified that he decided to leave but that before leaving he wanted to have a drink.

Defendant testified that when he picked up the bottle he had brought to the apartment two days earlier, Davila grabbed at it, slapped him, pushed him into a chair, spit in his face, and began insulting him, telling him that she was seeing another man who was a better lover than him. Defendant stated that when he heard Davila's words, he felt a pain in his chest and took out his gun. According to defendant, when Davila saw the gun she screamed "kill me." Defendant shot Davila and then left the apartment.

Defendant testified that after the shooting, he went to several bars where he continued to drink. Eventually, he arrived at the bar owned by Rivera, where he was arrested. Defendant stated that he had no memory of any of the discussions he had with the police following his arrest.

Miriam Devalle was called by the State in rebuttal. She testified that she was present in the apartment the night of the shooting, that Davila did not spit on or push defendant and that Davila did not insult defendant or tell him that she had a better lover. Devalle also testified that before the shooting, Davila repeatedly asked defendant to leave the apartment and that defendant told Davila that if he could not have her no one would.

Also called in rebuttal was Marisella Davila, Margarita Davila's sister. Marisella Davila testified that she too was in the apartment at the time of the shooting and that she heard her sister ask defendant to leave but that she did not hear her sister insult defendant or call him names.

After closing arguments, the jury was instructed in the applicable law. Among the instructions given were Illinois Pattern Jury Instructions, Criminal, No. 7.02 (murder) (2d ed. 1981) (hereinafter IPI Criminal 2d); IPI Criminal 2d No. 7.04 (voluntary manslaughter—provocation); and IPI Criminal 2d No. 7.06 (voluntary manslaughter—belief of justification).

During deliberations, the jury sent out a note stating that they were deadlocked and that they needed "further explanation on reasonable and provocation." In response, the court instructed the jury to review the instructions and to continue deliberating. Subsequently, a second note was sent out requesting transcripts of the testimony of defendant, Beltran, and Officer Magnus. The court responded to this note by informing the jury that it would attempt to locate the court reporter. Later, when the trial court asked the jurors if they still wanted to hear the requested testimony, they indicated that they had

reached a verdict. Defendant was found guilty of murder and sentenced to 28 years in prison.

In this appeal, defendant argues that his conviction for murder must be reversed because of the Illinois Supreme Court's ruling that the manslaughter instructions (IPI Criminal 2d Nos. 7.04, 7.06), misstated the burden of proof and constituted grave error. *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.

Under Illinois law, a person commits manslaughter when he acts under a sudden and intense passion resulting from serious provocation by the individual killed (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)), or if at the time of the killing, he possesses an unreasonable belief that the circumstances are such that they would justify or exonerate the killing (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b)). In *Reddick*, the Illinois Supreme Court held that the IPI instructions for murder and voluntary manslaughter incorrectly provided that the State was required to prove the mental conditions that reduce murder to manslaughter, when they should have provided that the State was required to disprove those conditions. *Reddick*, 123 Ill. 2d at 197.

Subsequently, the supreme court found that its holding in *Reddick* was of constitutional dimension and, therefore, should be applied in cases such as this that were pending on direct review at the time of the *Reddick* decision. (*People v. Shields* (1991), 143 Ill. 2d 435, 575 N.E.2d 538.) The supreme court also found that despite its characterization of the instructions as "grave error," its decision in *Reddick* did not mandate automatic reversal of convictions arising from trials in which the defective instructions were used. *Shields*, 143 Ill. 2d at 445.

Pointing out that in decisions subsequent to *Reddick*, it had ruled that the giving of the instructions could be harmless error (see *People v. Austin* (1989), 133 Ill. 2d 118, 549 N.E.2d 331; *People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241), the supreme court stated that in determining the effect of the instructions on the validity of a defendant's conviction, the instructions should not be judged in artificial isolation but should be considered in light of the record as a whole, including evidence and arguments presented to the jury (*Shields*, 143 Ill. 2d at 445-46). The supreme court added that the giving of the instructions would not constitute reversible error if shown to be harmless beyond a reasonable doubt. *Shields*, 143 Ill. 2d at 446-47.

*Shields* involved four consolidated appeals. After examining the facts of each appeal, the supreme court determined that the giving of the manslaughter instructions constituted plain error in two of the

cases, *Shields* and *Evans,* but was harmless beyond a reasonable doubt in the other two cases, *Fercsi* and *Thomas.*

In the two cases that were reversed, the supreme court observed that the evidence was closely balanced and that defendants had presented extensive evidence in support of their assertions that the killings were provoked or justified. (*Shields,* 143 Ill. 2d at 448, 451.) In the two other cases, the supreme court noted that there was no evidence, beyond defendants' own testimony, that they acted in self-defense or under sudden, intense passion. In those cases, the supreme court ruled that the evidence in support of defendants' convictions was so clear and convincing that the juries' verdicts would not have been different had the correct instructions been used. *Shields,* 143 Ill. 2d at 450, 454.

Since *Reddick,* this court has held in a number of cases that the giving of the manslaughter instructions may be harmless beyond a reasonable doubt. *People v. Green* (1991), 209 Ill. App. 3d 233, 568 N.E.2d 92; *People v. Sargent* (1990), 207 Ill. App. 3d 631, 207 N.E.2d 631; *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531.

In *Carter,* this court took note of the supreme court's statement in *Reddick* that the proof of a mental state associated with manslaughter is like an affirmative defense. This court held that, therefore, a defendant must produce enough evidence to put the defense in issue. The court added that once defendant meets this burden, the burden shifts to the State to disprove the mitigating mental conditions of voluntary manslaughter beyond a reasonable doubt. *Carter,* 177 Ill. App. 3d at 599.

This court found in *Carter* that there was no evidence beyond defendant's own testimony to support his version of the killing and ruled that, even if defendant's testimony was sufficient to shift the burden of proof to the State, the evidence showed beyond a reasonable doubt that the State had sustained its burden of disproving defendant's defenses. Therefore, we concluded that any error caused by the voluntary manslaughter instruction was harmless beyond a reasonable doubt. *Carter,* 177 Ill. App. 3d at 600.

A similar conclusion was reached in *Green.* There, we noted that it is voluntary manslaughter when one acts out of a sudden and intense passion resulting from serious provocation by another but that if the provocation is inadequate or if defendant attacks the victim out of proportion to the provocation, the crime is murder. Considering the facts of that case, we held that even if there was provocation for defendant's actions, it was in no way in proportion to the manner in which he retaliated. For that reason, we found no error in the giving

of the voluntary manslaughter instructions. *Green,* 209 Ill. App. 3d at 240.

Finally, in *Sargent,* this court found that a victim's verbal statements did not constitute provocation sufficient to support defendant's claim that he acted under a sudden and intense passion. Accordingly, we concluded that the voluntary manslaughter instruction was harmless beyond a reasonable doubt.

In the present case, the jury was given both the justification and provocation instructions. Turning first to the justification instruction, we find that the giving of this instruction did not constitute reversible error.

■■ Nothing in the record, including defendant's own testimony, supports a finding that defendant acted under a belief that the killing was justified. Davila was unarmed at the time of the shooting and, despite defendant's claim that Davila struck and pushed him, there was no claim that defendant was afraid of Davila or that he acted under the belief that his safety was threatened by her actions. Under these circumstances, the giving of the justification instruction was harmless beyond a reasonable doubt. See *People v. Dower* (1991), 218 Ill. App. 3d 844, 850.

■■ Turning to the provocation instruction, we find that under the supreme court's decision in *People v. McCarthy* (1989), 132 Ill. 2d 331, 547 N.E.2d 459, the giving of this instruction also did not amount to reversible error. Unlike the present case, where defendant argues that it was error to give the provocation instruction in the form in which it was given, in *McCarthy,* the issue was whether it was error to refuse to give the provocation instruction in light of defendant's claim that he murdered his former common law wife after discovering her in bed with another man. Although the issues raised are different, the rationale applied by the Illinois Supreme Court in *McCarthy* is applicable in the present case.

In *McCarthy,* the supreme court stated that although section 9—2(a) does not specify what types of conduct or provocation may serve to reduce the offense of murder to voluntary manslaughter, in Illinois those circumstances have been limited to four situations: substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. Mere words or gestures or trespass to property are not sufficient. *McCarthy,* 132 Ill. 2d at 340-41.

In rejecting defendant's claim that the provocation instruction should have been given, the supreme court noted that the provocation of adultery would not warrant use of the instruction when the spouses

are divorced (*People v. Strange* (1980), 81 Ill. App. 3d 81, 400 N.E.2d 1066), and ruled that, therefore, defendant was not entitled to the instruction because his "marital-type" relationship with the victim had ended two months prior to the shooting (*McCarthy*, 132 Ill. 2d at 342).

Here, there was evidence that defendant and Davila had lived together for several years, but that defendant had moved out of their apartment at Davila's insistence two years before the shooting. Thus, the "marital-type" relationship had ended, and defendant's claim that he was provoked by Davila's statement that she had another boyfriend and that this boyfriend was a better lover than defendant was not sufficient to entitle defendant to the provocation instruction. Moreover, as pointed out above, mere words are not sufficient provocation to reduce an offense from murder to manslaughter. (*McCarthy*, 132 Ill. 2d at 341.) Accordingly, we conclude that defendant was not entitled to the provocation instruction and that, therefore, the giving of the instruction was harmless beyond a reasonable doubt.

Defendant next argues that the trial court erred in denying his motion to suppress his post-arrest oral statements. Defendant contends that by refusing his attorney's request for a breathalyzer test, the State failed to preserve exculpatory evidence of defendant's intoxication, thereby violating his due process rights. Defendant also contends that had the test been given, he could have more effectively challenged his oral statements as "drunken ramblings."

In denying defendant's motion to suppress, the trial court found that while defendant could bring out the refusal to administer the breathalyzer test as a factor to be considered by the jury in determining the weight to be given defendant's statement, under *California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528, there was no requirement that defendant be given the test.

In *Trombetta*, the issue was whether due process precluded the admission into evidence of defendants' breath-analysis test results where the State of California failed to preserve the breath samples so that defendants could have their own tests run on them. The Supreme Court held that the due process clause of the fourteenth amendment did not require that the breath samples be preserved in order to introduce the test results at trial.

The Court stated that a failure to preserve evidence results in a constitutional violation where the evidence possesses an exculpatory value that is apparent before the evidence is destroyed and is of such a nature that defendant would be unable to obtain comparable evidence by other reasonably available means. (*Trombetta*, 467 U.S. at

489, 81 L. Ed. 2d at 422, 104 S. Ct. at 2534.) The Court held that given the reliability of the breath-testing procedures, there was no reason to assume that, if preserved, the samples would have been exculpatory. The Court also held that defendants were not without alternative means of demonstrating their innocence since they could have introduced evidence that the test was administered improperly or that equipment had malfunctioned. *Trombetta*, 467 U.S. at 489-90, 81 L. Ed. 2d at 422-23, 104 S. Ct. at 2534-35.

■ In the present case, there is no reason to believe that the results of a breathalyzer test would have led to suppression of defendant's statement. While the breathalyzer test results might have provided support for the testimony of defendant's witnesses, a result showing intoxication, in itself, would not render defendant's statement inadmissible. See *People v. Sleboda* (1988), 166 Ill. App. 3d 42, 519 N.E.2d 512; *In re Shutters* (1977), 56 Ill. App. 3d 184, 370 N.E.2d 1225; *People v. Moon* (1976), 38 Ill. App. 3d 854, 350 N.E.2d 179; see also *Commonwealth v. Lanoue* (1984), 392 Mass. 583, 467 N.E.2d 159 (rejecting a defendant's claim that the police had an obligation to ensure a voluntary, knowing, and intelligent waiver of *Miranda* rights through administration of a breathalyzer test).

In *Sleboda*, a breathalyzer test indicated that at the time of defendant's arrest, his blood-alcohol level was .22, more than twice the legal limit. In rejecting defendant's argument that his motion to suppress his statement should have been sustained because he was too intoxicated to knowingly waive his *Miranda* rights, the appellate court held that there was sufficient evidence that the waiver was knowingly made. The court based its conclusion on testimony that defendant was able to stand and walk unassisted, that he was responsive to questions, was able to follow directions, and did not have slurred speech. *Sleboda*, 166 Ill. App. 3d at 51-52.

In the present case, Officers Trempe, Enault, and Schak all testified that defendant appeared sober, was not disheveled, and had no difficulty walking and talking. However, Rivera and Edenson testified, and the trial court found, that defendant was under the influence of alcohol. Despite this fact, the trial court found that defendant's statement was voluntary. This conclusion was based on defendant's actions in turning over his gun to Rivera after the shooting and his conduct during his initial contact with the police, including his questioning of the officers.

A trial court's finding on the question of whether a defendant was so intoxicated as to make his statements involuntary will not be reversed unless it is against the manifest weight of the evidence. (*Sle-*

*boda,* 166 Ill. App. 3d at 51; *Shutters,* 56 Ill. App. 3d at 188; *Moon,* 38 Ill. App. 3d at 861.) Here, it would seem that there was sufficient evidence to support the trial court's finding that defendant was not so intoxicated that he was unable to make a knowing waiver of his *Miranda* rights and, therefore, we will not disturb that finding.

Defendant's final argument is that there was insufficient evidence to establish his guilt beyond a reasonable doubt. Defendant points out that under Illinois law when an accused presents evidence sufficient to reduce a murder charge to voluntary manslaughter, the State must prove beyond a reasonable doubt that defendant did not have that mental state. (*People v. Denson* (1985), 139 Ill. App. 3d 914, 487 N.E.2d 777; *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380.) Defendant argues, that here, he presented evidence that he was acting from a sudden and intense passion resulting from Davila's statement that she had another boyfriend who was a better lover than defendant. Defendant contends that the State failed to meet its burden of presenting evidence to negate his claim that he acted in response to serious provocation from Davila.

■ As we stated in our earlier discussion, mere words or gestures are not sufficient to reduce a charge from murder to manslaughter. (*McCarthy,* 132 Ill. 2d at 341.) Moreover, the provocation of adultery is not sufficient to reduce a charge to manslaughter where the parties are no longer in a "marital-type" relationship at the time of the act. *McCarthy,* 132 Ill. 2d at 342.

Thus, we find that there is no merit to defendant's claim that he presented evidence sufficient to reduce the murder charge to voluntary manslaughter or that the State failed to prove his guilt beyond a reasonable doubt.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SCARIANO, P.J., and DiVITO, J., concur.